# ENTRY ORDER

SUPREME COURT DOCKET NO. 2014-396

SEPTEMBER TERM, 2016

| | |
|---|---|
| Carole Kuligoski, Individually and On Behalf of Michael J. Kuligoski, and Mark Kuligoski and James Kuligoski | } APPEALED FROM: } } } Superior Court, Windham Unit, |
| v. | } Civil Division } |
| Brattleboro Retreat and Northeast Kingdom Human Services | } } DOCKET NO. 47-2-14 Wmcv |

In the above-entitled cause, the Clerk will enter:

An amended opinion has been issued in this case in response to motions for reargument. The opinion issued May 6, 2016, Kuligoski v Brattleboro Retreat, 2016 VT 54, is withdrawn and replaced by an amended opinion, Kuligoski v Brattleboro Retreat, 2016 VT 54A. The State of Vermont's motion to file for reargument as amicus curiae is granted. Appellees' and amici curiaes' motions for reargument are denied.

**REIBER, C.J. and SKOGLUND, J. dissenting.** After this opinion first issued in May 2016, the Court received an astonishing number of motions for reargument—from the parties, amici, and not least the State of Vermont, Agency of Human Services—urging the majority to reconsider its decision to impose a new, ill-defined, and unprecedented duty of care on mental health care providers in the State of Vermont.

The State's motion is especially noteworthy because it represents neither a party to the case nor one of the many amicus curiae invested in its outcome, but rather the broader interests of health care patients and their families statewide. The State's clear and dispassionate analysis of both the immediate and long term damage resulting from the majority's misguided judgment is essential reading for anyone interested in the subject. While far too nuanced to summarize adequately, the State's view is captured in its introduction, which is well worth quoting in full:

> The Court's May 6, 2016 decision imposes on mental health care providers a "duty of care to provide sufficient information" to a patient's "caretakers" so those individuals can "fully assume their caretaker responsibilities to assist [the patient] and protect against any harmful conduct in which he might engage. . . . " The ambiguous scope of this new duty creates the very real risk that providers—facing uncertain liabilities and potentially conflicting legal obligations—will err on the side of providing treatment in more restrictive settings and making more requests for involuntary treatment. The ruling thus has immediate and potentially far-reaching consequences for Vermont's system of care. It may also deter family members and others from helping to care for those with mental illness. . . . The Court should vacate the opinion and reconsider its decision to adopt this novel duty of care.

Unfortunately, although the majority has made changes to "narrow" its holding, the changes are entirely inadequate to address the harm identified by the State: the majority's failure to recognize that it has created and imposed on mental health care providers a duty so ill-defined and uninformed that even the best, and the best-intentioned, providers will be confused and conflicted as to their professional obligations. Ironically, although the majority clearly believes that its decision represents progressive thinking, it is at odds with the real interests of Vermont's health care providers, patients, and the public at large. The State is correct; the Court should grant the several motions for reargument, vacate its decision, and reject this novel duty.

FOR THE COURT:

_____
John A. Dooley, Associate Justice

Dissenting:                                          Concurring:


_____        _____
Paul L. Reiber, Chief Justice                   Beth Robinson, Associate Justice


_____        _____
Marilyn S. Skoglund, Associate Justice     Walter M. Morris, Jr., Superior Judge (Ret.), Specially Assigned

NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 54A

No. 2014-396

| | |
|---|---|
| Carole Kuligoski, Individually and On Behalf of Michael J. Kuligoski, and Mark Kuligoski and James Kuligoski | Supreme Court |
| | On Appeal from |
| | Superior Court, Windham Unit, |
| v. | Civil Division |
| Brattleboro Retreat and Northeast Kingdom Human Services | May Term, 2015 |

John P. Wesley, J.

Richard T. Cassidy and Matthew M. Shagam of Hoff Curtis, Burlington, for
 Plaintiffs-Appellants.

Ritchie E. Berger and Angela R. Clark of Dinse, Knapp & McAndrew, P.C., Burlington, for
 Defendant-Appellee Brattleboro Retreat.

Stephen J. Soule and Pamela L. Eaton of Paul Frank + Collins P.C., Burlington, for
 Defendant-Appellee Northeast Kingdom Human Services.

Joslyn L. Wilschek and Shireen T. Hart of Primmer Piper Eggleston & Cramer PC, Montpelier,
 for Amicus Curiae The Vermont Association of Hospitals and Health Systems.

O. Whitman Smith of Mickenberg, Dunn, Lachs & Smith, PLC, Burlington, for Amicus Curiae
 Vermont Council of Developmental and Mental Health Services, Inc.

Allan R. Keyes of Ryan Smith & Carbine, Ltd., Rutland, for Amici Curiae University of
 Vermont Medical Center, Central Vermont Medical Center and Rutland Regional Medical
 Center.

A.J. Ruben, Montpelier, for Amicus Curiae Disability Rights of Vermont, Inc.

PRESENT: Reiber, C.J., Dooley, Skoglund and Robinson, JJ., and Morris, Supr. J. (Ret.),
        Specially Assigned

¶ 1.    **DOOLEY, J.** This case arises out of the assault of Michael Kuligoski by a former

Brattleboro Retreat patient, E.R., after the patient was discharged from the Retreat, a mental health

treatment facility, and while he was undergoing outpatient treatment with Northeast Kingdom Human Services (NKHS). Plaintiff Carole Kuligoski, individually and on behalf of Michael, Mark Kuligoski, and James Kuligoski (collectively plaintiffs), filed suit in Windham Superior Court against defendants Brattleboro Retreat and NKHS, raising claims of failure to warn of E.R.'s danger to others, failure to train E.R.'s parents in handling E.R., failure to treat, improper release, and negligent undertaking. The superior court granted defendants' motions to dismiss for failure to state a claim, and plaintiffs appealed. We reverse on the failure to warn claim and train claims, and affirm on the failure to treat, improper release, failure to train, and negligent undertaking claims.

¶ 2.    Plaintiffs' complaint alleges the following facts,[1] as relevant to this appeal. On October 9, 2010, E.R. was voluntarily admitted to the Psychiatric Department at Central Vermont Medical Center (CVMC) with a "psychotic disorder" after having threatened young children in his home. During his first few days at CVMC, E.R. was easily agitated, made threatening remarks, reported auditory hallucinations, and had fair-to-poor judgment. The examining physician tentatively diagnosed E.R. with a schizophreniform disorder.

¶ 3.    On October 15, 2010, the medical professionals at CVMC completed the necessary documents to have E.R. involuntarily committed. The documents stated that he was mentally ill, posed a danger to himself and others, and was in need of involuntary hospitalization. The following day, E.R. was placed in restraints and transferred from CVMC to the Vermont State Hospital where a physician examined him and determined that he was a danger to others and, if released, would pose a danger to his family. There is no indication that either the documents

---

[1] Plaintiffs also brought an action against E.R., E.R.'s parents and E.R.'s grandparents seeking the same damages they seek in this action. See Kuligoski v. Rapoza, No. 42-2-113 Cacv (Vt. Sup. Ct. May 13, 2015). The superior court in that case granted summary judgment for defendants and dismissed the action on May 13, 2015. The parties have stipulated that we can use the decision in that case in deciding this appeal. We take that stipulation to mean that we can consider the undisputed facts as considered in that decision in addition to the factual allegations made in the complaint in this case. The statement of facts in the body of this opinion is based on both sources.

prepared at CVMC or the determination of the physician at the Vermont State Hospital were ever used to start a formal involuntary commitment proceeding. Nor is there an explanation of the basis on which E.R. continued to be held at the Vermont State Hospital. We can conclude only that E.R. must have been held as a voluntary patient.[2]

¶ 4.    While at the Vermont State Hospital, E.R. was administered anti-psychotic and anxiety medication. He repeatedly asked to leave the hospital, once tried to escape, threatened to punch out a window, and, although he denied having auditory hallucinations, was observed reacting to unseen stimuli. After E.R. reported feeling unsafe at the hospital, a social worker made a referral for his transfer to the Retreat, a nonprofit psychiatric hospital in Windham County, Vermont. Upon his discharge from the state hospital, he was diagnosed with schizophreniform disorder.

¶ 5.    On October 22, 2010, E.R. was examined by a physician at the Retreat who confirmed the state hospital's diagnosis. The physician reported that E.R. "had verbalized homicidal ideation toward staff." E.R. was thereafter placed on a staff-intensive treatment plan but continued to exhibit "grossly psychotic" behavior, lack of insight, and severely impaired judgment. His physician noted that he "required an in-patient level of care to prevent further

---

[2] Without filing an application in the superior court for involuntary treatment or accepting E.R. as a voluntary patient, the Vermont State Hospital could only hold E.R. for seventy-two hours after the physician's certification. See 18 V.S.A. § 7508(d). Since no court order was sought, we conclude that E.R. must have been considered a voluntary patient. Although the record does not show conclusively whether E.R. was an adult, the facts indicate that his symptoms first arose in 2009 at the beginning of his sophomore year in college and his hospital treatment occurred over a year later. It is very likely he was an adult, but was still living with his parents. In the text, we have considered him to be an adult.

We recognize that his status as a voluntary patient seems inconsistent with some of the later facts, including his attempt to escape from the Vermont State Hospital. Inconsistencies of this type are not unusual in a complaint.

5

decompensation."[3] Further reports indicate auditory and visual hallucinations, menacing behavior, and homicidal and suicidal ideation.

¶ 6. On November 1, 2010, E.R.'s physician noted that "E.R. continued to be floridly psychotic, probably paranoid, guarded and gradually improving but that he remained sufficiently ill that he totally lacked insight into his illness and that E.R. would be non-compliant with treatment outside of the hospital." He further noted that E.R. would remain on the treatment plan and be allowed out only for brief intervals.

¶ 7. During his time at the Retreat, E.R.'s behavior did not improve. In his November 10, 2010 assessment, E.R.'s physician stated that, if discharged, E.R. would be a high risk for decompensation, might stop his medication, and might not participate in aftercare treatment. Nevertheless, he stated that E.R. would be discharged on November 12.

¶ 8. On November 12, 2010, E.R.'s physician noted that he stopped taking his medication and had been hearing voices commanding him to kill himself. E.R. said of the commands, "I feel like I should do it." His physician wrote in his assessment, "Obviously [E.R.'s] refusal of medications is very worrisome and exactly what this writer was concerned about. Not only abstractly is it a bad idea, but he actually seems to have experienced an increase in his voices with only missing one night's medications." E.R. was, however, discharged that same day.

¶ 9. Throughout the period of his treatment at both the Vermont State Hospital and the Retreat, E.R. was closely monitored by his parents, with whom he had been living. Exactly what the parents were told at the time of discharge is disputed, although it appears they were told that E.R. "might have schizophrenia." They understood that E.R. was "going through a phase and would recover."

---

[3] In psychiatry, decompensation constitutes the "failure to generate effective psychological coping mechanisms in response to stress, resulting in personality disturbance or disintegration, especially that which causes relapse in schizophrenia." Oxford English Dictionary (Oxford Univ. Press 2015), https://perma.cc/B6FR-VVF8.

¶ 10. In the discharge summary, E.R.'s physician again stated that E.R. was a high risk for poor compliance with post-discharge treatment; E.R. had been diagnosed as having a "psychotic disorder, not otherwise specified"; and that E.R.'s parents believed his mental health was related to his breakup with a girlfriend in 2009 or possibly a sequela resulting from mononucleosis. He stated that E.R. met the criteria for schizophrenia or, at the very least, schizophreniform disorder.

¶ 11. Prior to E.R.'s discharge, the Retreat developed an aftercare treatment plan with E.R.'s parents that involved regular visits to NKHS. E.R. was also prescribed daily medication, which his mother was told to administer to him. E.R.'s mother believed that E.R.'s condition had considerably improved at the time of his release.

¶ 12. On December 1, 2010, E.R. met with a treatment team at NKHS and signed a cognitive remediation therapy plan. A week later, a member of the treatment team completed a Substance Abuse Addendum, in which he stated "that E.R. was a high risk for Dimension 3 of the Client Placement Criteria (emotional, behavioral or cognitive conditions/complications) because E.R. had recently been diagnosed with a psychotic disorder and had minimal insight surrounding the diagnosis."

¶ 13. In mid-December, E.R. told his mother that he had stopped taking his medication. She called NKHS and spoke with one of the physicians on E.R.'s treatment team. The physician told E.R.'s mother that this was a cause for concern but that E.R. had to decide to take care of himself. E.R. did not meet with anyone at NKHS between mid-December 2010 and March 2011, and no one at NKHS reached out to E.R. during that time or took any action with respect to E.R.'s medication regime.

¶ 14. On February 26, 2011, E.R. accompanied his father to an apartment building in St. Johnsbury owned by E.R.'s grandparents. Plaintiff Michael Kuligoski was also at the apartment building, working on the furnace. E.R. went down to the basement where Mr. Kuligoski was working and assaulted him, causing serious injuries. The forensic psychiatrist who evaluated E.R.

7

at the request of the criminal court stated that the night before the offense E.R. had not slept well, awoke early that morning, was just "sitting and staring," and was paranoid that people were staring at him en route to the apartment. The psychiatrist believed that E.R. likely was in a "psychotic haze" at the time of the offense, having been "overcome by the symptoms of his condition to the degree where he acted while in a psychotic storm."

¶ 15. Plaintiffs filed a complaint in superior court, alleging seven counts: (1) the Retreat was negligent in discharging E.R. knowing of his dangerous tendencies and that he was a high risk for decompensation; (2) the Retreat was negligent in failing to warn E.R.'s parents that he posed a risk to the general public; (3) the Retreat was negligent in failing to train E.R.'s parents how to supervise him, monitor and manage his medications, and take necessary and appropriate measures to protect potential victims; (4) the Retreat was negligent in its undertaking "to render a service that it recognized or should have recognized as necessary for the protection of third persons"; (5) NKHS was negligent in failing to warn E.R.'s parents that he posed a risk to the general public; (6) NKHS was negligent in failing to take "immediate and affirmative steps" to treat E.R.; and (7) NKHS was negligent in undertaking its duty to render services to E.R. Although the complaint itemized separate counts, plaintiffs emphasized in the superior court, as well as in this Court, that the counts were based on a common "duty of reasonable care to act to avoid needless risk to the safety of third parties" based on the "special relationship" that existed between the Retreat and NKHS and their patient, E.R.

¶ 16. Defendants moved to dismiss the respective claims against them, pursuant to Vermont Rule of Civil Procedure 12(b)(6). They both argued that they owed no duty to protect plaintiffs from attack by E.R. and that their alleged negligence was not the proximate cause of plaintiffs' injuries. The superior court granted both motions. Relying largely on our decision in Peck v. Counseling Service of Addison County, Inc., 146 Vt. 61, 499 A.2d 422 (1985), the superior court concluded that defendants owed no duty to plaintiffs because Michael Kuligoski was not an identifiable victim and defendants were under no duty to control E.R. With respect to the third-

8

party duty, the court explained that plaintiffs' claims "would push the ruling by the <u>Peck</u> majority far beyond the bounds of the holding as limited by the facts there, and the recognition of those claims would stake out expansive new territory not warranted by proper respect for the separation of powers." As to the duty of defendants to control E.R., the court emphasized Vermont's "policy of keeping mentally-ill persons in the least restrictive environment possible." This appeal followed.

¶ 17. On appeal, plaintiffs generally argue that the superior court erred in holding that <u>Peck</u> barred its claims. They contend that, while <u>Peck</u> involved an identifiable victim, its holding should not be read as limiting its reach <u>only</u> to identifiable victims. They argue that this reading is supported by public policy protecting the public from dangerous individuals and is consistent with modern tort scholarship, such as the Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 41 (2012). Plaintiffs argue that the trial court erred in concluding at this stage of the case that there was no proximate cause. As we explain in our discussion below, we hold that <u>Peck</u> and other precedents bar plaintiffs' duty-to-treat and negligent-undertaking claims. However, we also hold that <u>Peck</u> extends to identifiable and <u>foreseeable</u> victims, and that plaintiffs' duty-to-warn claims should not be dismissed at this stage in the litigation.

¶ 18. We review the superior court's decision "on a motion to dismiss de novo under the same standard as the trial court and will uphold a motion to dismiss for failure to state a claim only if it is beyond doubt that there exist no facts or circumstances that would entitle the plaintiff to relief." <u>Birchwood Land Co. v. Krizan</u>, 2015 VT 37, ¶ 6, 198 Vt. 420, 115 A.3d 1009 (quotation omitted). "We assume as true all facts as pleaded in the complaint, accept as true all reasonable inference[s] derived therefrom, and assume as false all contravening assertions in the defendant's pleadings." <u>Id</u>. We are "limited to determining whether the bare allegations of the complaint are sufficient to state a claim." <u>Id</u>. (quotation omitted).

## I. The Duty of Care

¶ 19.    "The existence of a duty is a question of law to be decided by the Court." Sorge v. State, 171 Vt. 171, 174, 762 A.2d 816, 819 (2000).  Once a legal duty is established, as well as breach of that duty, there must be factual causation for the defendant to be subject to liability for the harm caused to the plaintiff.  See id. (requiring duty before determining causation).  "Ordinarily, proximate cause is a jury issue unless the proof is so clear that reasonable minds cannot draw different conclusions or where all reasonable minds would construe the facts and circumstances one way." Estate of Sumner v. Dep't of Soc. & Rehab. Servs., 162 Vt. 628, 629, 649 A.2d 1034, 1036 (1994) (mem.) (quotation omitted).  On this motion to dismiss, some factual development is necessary to reach the causation issue and determine whether, in light of any possible duty and breach of that duty, there could be proximate cause sufficient for liability.

¶ 20.    Before addressing the specific issues, we start with a discussion of the duty to third parties generally, as well as the specific duty of mental health professionals to their patients and nonpatient third parties.  In doing so, we note that the main issues in this case do not arise from a dispute as to whether defendants had a general duty of care, or even whether that duty extends to nonpatients in appropriate circumstances, but rather to the specific elements of that duty.  Thus, we are starting at the most general level where there is only limited disagreement between the parties, and moving to more specific levels where the sharp disagreement emerges.  As we have repeatedly stated, background principles of negligence provide that "duty is not sacrosanct in itself, but only 'an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection.' " Sorge, 171 Vt. at 177, 762 A.2d at 820 (quoting W. Prosser & W. Keeton, The Law of Torts § 53, at 358 (5th ed. 1984)).  The existence of a duty is "a question of fairness" and "involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution." Id. (quotation omitted).

¶ 21.    The modern law on duty comes from the Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 41 (2012), which provides:

10

(a) An actor in a special relationship with another owes a duty of reasonable care to third parties with regard to risks posed by the other that arise within the scope of the relationship.

(b) Special relationships giving rise to the duty provided in Subsection (a) include:

. . .

(4) a mental-health professional with patients.

This Restatement section replaces three sections of the Restatement (Second) of Torts (1965), which have been used extensively in defining the duty owed by a mental health professional or institution to third parties injured by a patient. See id. §§ 315(a), 319, 324A.

¶ 22.   Comment g to § 41 of the Third Restatement addresses the duty of mental health professionals to third parties. The duty begins with the physician using "customary care" to determine whether a patient poses a risk of harm to others. "Once such a patient is identified, the duty imposed by reasonable care depends on the circumstances" and "may require providing appropriate treatment, warning others of the risks posed by the patient, seeking the patient's agreement to a voluntary commitment, making efforts to commit the patient involuntarily, or taking other steps to ameliorate the risk posed by the patient." Id. Although courts have been hesitant to embrace duties any broader than those to "reasonably identified" victims, § 41 sets no express limit on individuals to whom the duty is owed. Because "[r]easonable care itself does not require warning individuals who cannot be identified," the proper inquiry is "a question of reasonable care, not a question of the existence of a duty." Id. "However, when reasonable care requires confining a patient who poses a real risk of harm to the community, the duty of the mental-health professional ordinarily extends to those members of the community who are put at risk by the patient." Id. Because patients who are not in custody cannot be controlled in the traditional understanding of the term, the duty imposed on mental-health professionals "is only one of reasonable care." Id. Despite this duty, a "health-care professional can pursue, and may have a

statutory obligation to seek, involuntary commitment of patients who are dangerous to themselves or others." Id.

¶ 23.   We have not had the occasion to address § 41(b)(4), and no other court has explicitly adopted it.  Nonetheless, we note that the principles enunciated in § 41 build upon those of § 315 et seq. of the Second Restatement, and are an evolution of the duties articulated in decades of case law.

¶ 24.   The history of this duty of care of mental health professionals or institutions with respect to nonpatient third parties begins with the California Supreme Court's decision in Tarasoff v. Regents of University of California, 551 P.2d 334 (Cal. 1976).  This landmark case established that mental health professionals have a duty to warn "would-be" victims of a patient's dangerous conduct.  Id. at 346.  In Tarasoff, a patient at the University of California's Cowell Memorial Hospital informed his therapist that he was planning to kill an unnamed girl—readily identifiable to the therapist as the victim Tatiana Tarasoff—after she returned from her summer in Brazil.  Id. at 341.  Although the mental health staff sought the authority to petition for the patient's commitment, the university police took the patient into custody briefly and released him after he promised to stay away from the victim.  Id.  Shortly after Tarasoff's return, the patient went to her residence and killed her.  Id.

¶ 25.   Tarasoff's parents filed a negligence suit against the university, the psychotherapists employed by the university hospital, and the campus police claiming that the defendants owed a duty to protect their daughter from the patient and breached that duty by failing to warn the plaintiffs of the patient's threats and failing to confine the patient under a California statute that governs the involuntary commitment of individuals with mental health disorders.  The California Supreme Court concluded that the defendants were shielded by governmental immunity from liability under the statute for failing to confine the patient, and addressed only the merits of the duty-to-warn claim.  Id. at 341-42.

12

¶ 26.    In conducting its analysis into the defendants' duty to warn, the California court balanced a number of considerations, including

> the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.

Id. at 342 (quotation omitted).  Although foreseeability is a significant factor, the court noted that, in avoiding foreseeable harm, a defendant will not be required to control the conduct of another person or warn of such conduct unless "the defendant bears some special relationship to the dangerous person or to the potential victim."  Id. at 343.  The court then concluded that a special relationship existed between a therapist and patient, and that "[s]uch a relationship may support affirmative duties for the benefit of third persons."  Id.  The court found that the interest in protecting a potential victim who has been threatened by a patient outweighs the countervailing policy considerations, such as doctor-patient confidentiality, the difficulty of predicting a patient's future violent acts, and the risk of unnecessary warnings.  Id. at 345-46.

¶ 27.    Importantly, while the court observed that its prior decisions recognizing such a duty involved situations where the defendant maintained a special relationship with both the victim and the person whose conduct created the danger, see, e.g., Johnson v. State, 447 P.2d 352, 355 (Cal. 1968) (upholding suit against state for failure to warn foster parents of dangerous tendencies of child), it concluded the duty should not "logically be constricted to such situations."  Id. at 344. As guidance, the court cited cases from other jurisdictions recognizing such a duty in the context of doctors failing to warn their patients not to drive when taking certain medications for the safety of the general public, or failing to warn the family members of patients with contagious diseases. Id.

13

¶ 28. As the California Supreme Court summarized:

> [The] defendant therapists cannot escape liability merely because [the victim] herself was not their patient. When a therapist determines, or pursuant to the standards of his profession should determine, that his patient presents a serious danger of violence to another, he incurs an obligation to use reasonable care to protect the intended victim against such danger. The discharge of this duty may require the therapist to take one or more of various steps, depending upon the nature of the case. Thus it may call for him to warn the intended victim or others likely to apprise the victim of the danger, to notify the police, or to take whatever other steps are reasonably necessary under the circumstances.

Id. at 340. In summary, Tarasoff held that a therapist has a duty to warn either "the endangered party or those who can reasonably be expected to notify him." Id. at 347.

¶ 29. On the heels of Tarasoff came the California Supreme Court's decision in Thompson v. County of Alameda, 614 P.2d 728 (Cal. 1980), which further articulated the duty to warn when a potentially dangerous individual makes a generalized threat to the general public or a segment of the population—i.e., an unidentifiable victim. In Thompson, a juvenile offender had been in the custody of a county institution under a court order. Id. at 730. After he was released on temporary leave into his mother's custody, he murdered a neighboring child in the garage of his mother's home. Id. The complaint alleged that the county knew of the juvenile's "latent, extremely dangerous and violent propensities regarding young children and that sexual assaults upon young children and violence connected therewith were a likely result of releasing (him) into the community." Id. The complaint also alleged that the county knew the juvenile offender "had indicated that he would, if released, take the life of a young child residing in the neighborhood," although he gave no indication of any specific child he intended to harm. Id.

¶ 30. The plaintiffs, the parents of the victim, claimed that the county was negligent in releasing the juvenile into the community and failing to warn the juvenile's mother, the local police, or "parents of young children within the immediate vicinity" of his mother's residence. Id. In deciding the extent of the duty, the court turned to Tarasoff, emphasizing that the holding extended to "specifically foreseeable and identifiable victim[s] of the patient's threats." Id. at 734.

14

The court also reiterated Tarasoff's words of caution—that " 'the open and confidential character of psychotherapeutic dialogue encourages patients to express threats of violence, few of which are ever executed' " and that " 'a therapist should not be encouraged routinely to reveal such threats' " because " 'such disclosures could seriously disrupt the patient's relationship with his therapist and with the persons threatened.' " Id. (quoting Tarasoff, 551 P.2d at 347). The court also cautioned that a therapist should not disclose confidential information unless necessary to avert danger and that " 'even then that he do so discreetly, and in a fashion that would preserve the privacy of his patient to the fullest extent' " possible. Id. (quoting Tarasoff, 551 P.2d at 347). The Thompson court interpreted Tarasoff to require as a precondition of liability that the victim be "readily identifiable," if not "specifically named." Id. The court thus rejected the plaintiffs' attempt to impose "blanket liability" on the county for failing to warn the parents of the victim or other neighborhood children, the police, or the juvenile's mother. Id. The court based its decision on policy considerations, as well as "foreseeability" within the context of the case. Notably, the court considered the "practical obstacles" to imposing a broad duty:

> In our view, the generalized warnings sought to be required here would do little to increase the precautions of any particular members of the public who already may have become conditioned to locking their doors, avoiding dark and deserted streets, instructing their children to beware of strangers and taking other precautions. By their very numbers the force of the multiple warnings required to accompany the release of all probationers with a potential for violence would be diluted as to each member of the public who by such release thereby becomes a potential victim. Such a warning may also negate the rehabilitative purposes of the parole and probation system by stigmatizing the released offender in the public's eye.

Id. at 736.

¶ 31. Thus, the court found that warnings to both the police and the parents of neighborhood children would be of little beneficial effect. Id. As specifically relevant to this case, the California high court considered the effect of warnings to the juvenile offender's mother, into whose custody he was released. Id. at 737. The court concluded that such a warning would not

15

have the desired effect of warning the potential victims because the mother would not be likely to volunteer information to neighborhood parents that her son posed a threat to their welfare, "thereby perhaps thwarting any rehabilitative effort, and also effectively stigmatizing both the mother and son in the community." Id. The court did not find persuasive the dissent's reasoning "that the mother 'might' have taken special care to control her son had she been warned of [his] threats," concluding that such "attenuated conjecture" cannot alone support the imposition of liability. Id. The court distinguished Johnson, 447 P.2d at 355, which held that the state had a duty to warn the foster family of a child's dangerous tendencies, because it was the family in Johnson that was endangered, whereas the mother in Thompson was not herself endangered and would be expected to supervise her son "for the remote benefit of a third party." Thompson, 614 P.2d at 737.

¶ 32.    In Vermont, our most significant decision on the duty of mental health professionals to third parties is Peck, 146 Vt. 61, 499 A.2d 422, a duty to warn case.[4] Like Tarasoff, Peck deals with the failure to warn an identified victim and expressed a broad general duty of the mental health professional or institution to third parties affected by the conduct of the patient. Unlike Tarasoff, the patient threatened the property, rather than the person, of the plaintiff. Id. at 64, 499 A.2d at 424. In Peck, the plaintiffs sued a mental health agency for damages to their property after their son set fire to their barn. Id. At the time of the incident, the son was an outpatient of Counseling Service of Addison County and was living at home with his parents. Id. at 63, 499 A.2d at 424. After a fight with his father, the son left home and went to the Counseling Service to

_____

[4] Peck is a 3 to 2 decision with no majority opinion. Justice Underwood concurred in the result but did not join the opinion of Justice Hill, which explained the rationale for reaching that result. Justice Underwood did not author a concurring opinion explaining why he disagreed with the rationale of Justice Hill's opinion. The dissent authored by Chief Justice Billings, and joined by Justice Peck, argued that the mental health professional had no duty to third parties and the recognition of any such duty should be undertaken by the Legislature and not by this Court.

The plurality opinion of Justice Hill has been cited and quoted in part in later opinions of this Court without an explanation that it is not a majority opinion. See, e.g., Lenoci v. Leonard, 2011 VT 47, ¶ 15, 189 Vt. 641, 27 A.3d 694 (mem.); Smith v. Day, 148 Vt. 595, 597, 598, 538 A.2d 157, 158, 159 (1999). We have similarly done so here. To the extent that is necessary for the opinion reached herein, we adopt the opinion of Justice Hill.

16

speak with his therapist. Id. He told his therapist about the fight and that "he didn't think his father cared about him or respected him." Id. At a following session, the son stated that he was still angry with his father, and told his therapist that he "wanted to get back at his father" by "burn[ing] down his barn." Id. at 64, 499 A.2d at 424. After discussing the consequences of the act, the son promised his therapist that he would not burn down the barn. The therapist did not disclose these threats to the parents or any other staff members of Counseling Service. Several days later, the son set fire to his parents' barn, which was completely destroyed. Id. at 63, 499 A.2d at 424. The parents claimed that the therapist had a duty to protect them from their son's violent behavior, that the therapist knew or should have known that their son presented an unreasonable risk of harm to them, and that the therapist breached that duty by failing "to take steps that were reasonably necessary to protect" them. Id. at 64.

¶ 33. The Peck Court began its analysis with the Restatement (Second) of Torts § 315, which provides that a duty arises if: "(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives to the other a right to protection." The Court concluded that "the relationship between a clinical therapist and his or her patient 'is sufficient to create a duty to exercise reasonable care to protect a potential victim of another's conduct,' " id. at 65, 499 A.2d at 425 (quoting Tarasoff, 551 P.2d at 343), even though the level of control over an outpatient may be less than that exercised over institutionalized patients. Id. The Court noted that "Vermont already recognizes the existence of a special relationship between a physician and a patient that imposes legal duties on the physician for the benefit of third persons," citing statutes requiring doctors to warn others of contagious diseases to protect the public health. Id. For example, 18 V.S.A. § 1004, which has not been amended since the time of the Peck decision, provides that: "A physician who knows or suspects that a person whom he or she has been called to attend is sick or has died of a communicable disease dangerous to the public health shall immediately quarantine and report to the health officer the place where such case exists."

17

Accordingly, the Court saw no reason why the same duty should not exist in a mental health setting. Id.

¶ 34. In imposing a duty on the therapist, the Court rejected the defendant's arguments that a mental health professional cannot predict future violent behavior and that physician-patient privilege protects against disclosure of confidential information. Id. at 66, 499 A.2d at 425; see also 12 V.S.A. § 1612(a). After quoting at length from Tarasoff, the Court noted that the trial court found sufficient facts to demonstrate that the therapist knew or should have known the defendant posed a threat to his parents and that the failure of the therapist to reveal that threat "was inconsistent with the standards of the mental health profession." Id. at 66, 499 A.2d at 425-26. Ultimately, we held that "a mental health professional who knows or, based upon the standards of the mental health profession, should know that his or her patient poses a serious risk of danger to an identifiable victim has a duty to exercise reasonable care to protect him or her from that danger." Id. at 68, 499 A.2d at 427.

## II. The Duty to Warn

¶ 35. Having set out the nature of duties for tort actions and the important sources of law for defining the duties of mental health professionals to third parties injured by their patients, we look at the specific duties alleged in plaintiffs' complaint in this case. As we stated above, the positions of the parties begin to differ when we look at the specific duties alleged. The decisions from around the country reflect these differences. Although the central holding of Tarasoff has been widely accepted around the country, the same is not true for extensions of the duty beyond providing warnings. Further, courts in other jurisdictions are divided on how far to extend the Tarasoff duty to warn, and the subsequent limitation on that duty expressed in Thompson.

¶ 36. We first consider plaintiffs' allegations that defendant, Brattleboro Retreat, breached its duties to warn E.R.'s parents of the risk of his dangerous behavior and to train them in how to handle him. In examining the duty of defendant, we put these claims together under the general description of duty to warn and consider later whether separate duties are involved. Courts

18

differ when evaluating a claim of a duty to warn someone other than an identified victim. As discussed previously, several courts have limited the duty to identifiable victims, or a class of individuals whose injury is foreseeable because of their relationship or proximity to a specifically identifiable victim. See, e.g., Dawe v. Dr. Reuven Bar-Levav & Assocs., P.C., 780 N.W.2d 272, 278 (Mich. 2010) (establishing duty to warn for mental health professionals when patient makes threat of violence against "reasonably identifiable third person" and has apparent intent and ability to carry out threat); Emerich v. Philadelphia Ctr. for Human Dev., Inc., 720 A.2d 1032, 1040-41 (Pa. 1998) (stating that psychotherapist has duty to warn only when specific and immediate threat of serious bodily injury has been made against "specifically identified or readily identifiable victim"). The reasoning is much the same in these decisions, as they reflect the policies set forth by the California Supreme Court in Thompson. See, e.g., Fraser v. United States, 674 A.2d 811, 816 (Conn. 1996) (stating that "the interests of the mental health profession in honoring the confidentiality of the patient-therapist relationship and in respecting the humanitarian and due process concerns that limit the involuntary hospitalization of the mentally ill" counsel against imposing "liability for harm to unidentifiable victims or unidentifiable classes of victims" (citations omitted)). Many of these courts also rely on their existing precedent in the area of negligence, citing the limitations on third-party liability already recognized in their common law. Id. at 815-16 (observing that scope of liability in negligence to injured third parties has not been enlarged by changes in tort law).

¶ 37.   However, several other courts have held that a duty to warn is owed not only to specifically identified or identifiable victims, but to foreseeable victims or to those whose membership in a particular class—for example, those living with the patient—places them within a zone of danger. See, e.g., Lipari v. Sears, Roebuck & Co., 497 F. Supp. 185, 194-95 (D. Neb. 1980) (applying Nebraska law) (holding that if psychiatrist can reasonably foresee risk of harm to plaintiffs or "class of persons" of which plaintiffs were members, he or she has duty to warn, even if victims are not specifically identified); Naidu v. Laird, 539 A.2d 1064, 1073 (Del. 1988) (stating

19

psychiatrist has duty to warn "potential victims or a class of potential victims" when "in accordance with the standards of the profession," psychiatrist knows or should know that patient's "dangerous propensities present an unreasonable risk of harm to others"); Schuster v. Altenberg, 424 N.W.2d 159, 165 (Wis. 1988) (noting that psychotherapist's duty to warn "is not limited by requirement that threats made be directed to an identifiable target" as it must simply be foreseeable that omission "may cause harm to someone").

¶ 38.    Plaintiffs ask that we construe Peck broadly to find that E.R.'s parents should have been warned of his propensities in order to protect third parties.  Defendants, on the other hand, focus on the language in our holding that specifies an "identifiable victim," a factor absent here.  They argue that Peck is specifically limited to the circumstance where there is an identifiable victim and should be interpreted to hold that there is no duty to warn in the absence of such a victim.  We note that none of our more recent cases have expanded the duty articulated in Peck to unforeseeable victims.  Nevertheless, we agree with plaintiffs that the specific liability holding of Peck is based on the facts and circumstances that were before the Court.  Thus, while Peck finds a duty to warn an identifiable victim, it does not hold that liability is limited to those circumstances and in fact draws on public health cases where there is no identified victim.[5]  In saying this, we

---

[5]  Peck relied in part on the decision of a New Jersey court in McIntosh v. Milano, 403 A.2d 500 (N.J. Super. Ct. Law Div. 1979).  That decision drew heavily on the duty a physician has to the public when encountering a case of a communicable disease to explain the duty of a mental health professional with a dangerous patient.  The court reasoned:

> To summarize, this court holds that a psychiatrist or therapist may have a duty to take whatever steps are reasonably necessary to protect an intended or potential victim of his patient when he determines, or should determine, in the appropriate factual setting and in accordance with the standards of his profession established at trial, that the patient is or may present a probability of danger to that person. The relationship giving rise to that duty may be found either in that existing between the therapist and the patient, as was alluded to in Tarasoff II or in the more broadly based obligation a practitioner may have to protect the welfare of the community, which is analogous to the obligation a physician has to warn third persons of infectious or contagious disease.

20

are also cognizant of the fact that Peck was decided thirty years ago, before modern trends in this area, such as the Restatement (Third) of Torts § 41.

¶ 39.    The dissent cites a number of cases that it argues show that the majority rule is that there is no duty to warn anyone other than an identified victim.  Post, ¶¶ 87-90.  In fact, most of these cases, including Tarasoff, do not contain such a limitation.  As we set out above, Tarasoff contains this explanation of the duty: "Thus it may call for him to warn the intended victims or others likely to apprise the victim of the danger, to notify the police, or to take whatever other steps are reasonably necessary under the circumstances."  Tarasoff, 551 P.2d at 342.

¶ 40.    Other cases, including Fraser, 674 A.2d at 817—a duty to treat and not a duty to warn case—acknowledge that the duty can extend to persons in the zone of danger, one of the bases for this decision.  The court in Estates of Morgan v. Fairfield Family Counseling Center, 1997-Ohio-194, 673 N.E.2d 1311, 1328, explicitly reserves the issue: "We need not determine at this time whether and to what extent the readily identifiable victim rule should attach in a failure-to-warn case.  The case sub judice does not involve any allegation that [the defendants were] negligent in failing to warn [the plaintiff's] family."  In Emerich, 720 A.2d at 1040 n.8, the court stated: "We are not required to address the related issue of whether this duty to warn may be discharged by notifying relatives of the victim, other individuals close to the victim, or the police."  In fact, the only case cited by the dissent that recognizes the Tarasoff duty but limits the required warning to an identified victim is Eckhardt v. Kirts, 534 N.E.2d 1339 (Ill. App. Ct. 1989), a twenty-seven year old intermediate appellate court decision.  The dissent asserts here that a holding that

---

Id. at 511-12 (footnote omitted).

The communicable disease cases continue to be strong indicators of an extended duty.  For example, in C.W. v. Cooper Health System, 906 A.2d 440, 450 (N.J. Super. Ct. App. Div. 2006), the court that decided McIntosh held that a physician owed a duty to a patient and to others, specifically the patient's partner and child, to disclose the patient's HIV-positive status.

21

the duty to warn extends beyond the identified victim represents an unacknowledged minority position. We reject that assertion because it is not true.

¶ 41. We agree that the Peck holding does not apply to a duty to warn the general public. The complaint here expresses a much narrower duty: to warn E.R.'s caretakers, here, his parents. It alleges that the warnings would have informed them such that they could have properly supervised E.R. Any warning to E.R.'s parents would not have been predicated on their membership in the public at large, however, and would have been predicated on their assumption of custody and caretaking responsibilities of E.R., even though an adult, from the Retreat. For two reasons, which circumscribe the scope of the duty we now recognize, we conclude that the Retreat had a duty to give such warnings.

¶ 42. The first reason involves the unique circumstances of this case. The complaint alleges that the parents had assumed the role of E.R.'s caretakers even though he was an adult. The extended record shows that the parents were directly involved in E.R.'s care and treatment from the first time that he showed symptoms of mental illness and were involved in controlling his conduct. This meant that they had assumed responsibilities, the discharge of which could be affected by the information they received. For example, the limited facts indicate that in a discharge conference, Retreat staff told E.R.'s mother that she should give E.R. his medication, but also indicate that E.R. stopped taking medication on his own after discharge. A complete warning of the effect of E.R. discontinuing the medication may have affected the parents' degree of involvement in ensuring E.R. took his medication.

¶ 43. Because the parents were monitoring E.R.'s needs and treatment, and were involved in his discharge, they were available to receive information on his continuing need for treatment and the actions that should have been taken based on his behavior. In fact, the complaint alleges that the Retreat's mental health professional, who was aware of the risk that E.R. would suffer decompensation and stop his medications if discharged, had "discussed discharge with E.R.'s mother" before determining such a course was possible. Moreover, before the discharge,

22

the Retreat made an aftercare treatment plan "with E.R. and his parents." The complaint thus supports an inference that if E.R. had not had parents into whose care he could be released, parents who could monitor his symptoms and medication intake, Brattleboro Retreat would not have authorized his release.

¶ 44. Again, we emphasize that we are dealing with a case that was dismissed on the pleadings with no factual development.[6] We conclude that by transferring custody of a patient with a psychotic disorder to caretakers whom they knew lacked psychiatric training and experience, the Retreat owed a duty of care to provide reasonable information to the parents to enable them to recognize the dangers and fulfill the responsibilities envisioned for them in the treatment plan. In adopting this duty definition, we are relying upon Peck, as well as precedents from other jurisdictions and the Restatement (Second) of Torts §§ 315 and 319. Although we have discussed it above for background, we have not adopted and relied upon § 41(b)(4) of the Restatement (Third) of Torts. We recognize that there are contrary decisions from some of our sister states, but generally we find them distinguishable. For example, in In re Votteler's Estate, 327 N.W.2d 759, 760 (Iowa 1982), the plaintiff was injured when a patient suffering from a serious mental illness ran over her with a car. The plaintiff alleged that the patient's psychiatrist was negligent in failing to warn the patient's husband, a friend of the plaintiff, of the danger the patient presented to the public "so he could have protected [the] plaintiff." Id. In its ruling, the Iowa Supreme Court held that the Tarasoff rule could not be "stretched" to support finding a cause of action against a psychiatrist in these circumstances, as such a theory would "attenuate[] the Tarasoff rule beyond the breaking point." Id. at 761. However, the decision was based on the

---

[6] The dissent goes through some of the known facts apparently to assert that the Retreat took many steps to inform the parents of the risk and how to deal with it, but those steps were not successful in controlling the risk of E.R.'s violent actions, and demanding any more involves the imposition of unreasonable policy judgments. Post, ¶¶ 102-105. At this point, the dissent's concerns are premature and speculative because no facts are established for purposes of the motion to dismiss. It may be that the facts will show that the Retreat completely explained the risks and how parents should respond to them. It may be otherwise as plaintiffs allege. Neither assessment is possible on the very limited record before us.

23

particular facts of the case. Unlike in Tarasoff, the record "lack[ed] any basis for finding the therapist knew of the danger" the patient presented, id. at 762, but instead, contained overwhelming evidence to suggest the plaintiff was herself well aware of the patient's violent propensities; indeed, the patient had told the plaintiff on multiple occasions that "she would kill her." Id. at 761.

¶ 45. By contrast, the complaint here is replete with allegations that staff members at Retreat were well aware of E.R.'s capacity for violence. Upon his admission at the Retreat, E.R.'s records from the Vermont State Hospital were reviewed, including the findings by his intake physician that E.R. was "clearly a danger to others" and would be a "danger to his own family" if released. He verbalized "homicidal ideation" toward staff only nine days after his admission to the Retreat, and throughout his stay, continued to have auditory hallucinations which commanded him to kill himself or others. E.R.'s behavior was so aggressive that his psychiatrist adopted an Alternative Low Stimulation Area (ALSA) treatment plan, which involves "placing patients who are verbalizing or demonstrating they are unsafe in a special area" that is staff-intensive and free from any objects that can be used to harm the self or others. Indeed, it appears from the complaint that E.R. was kept in ALSA for all but the first nine days of his stay at the Retreat.

¶ 46. Because the case never went beyond the complaint stage, there is no allegation that the parents were aware of E.R.'s risk of danger such that they could be charged with "knowledge of the danger as a matter of law" sufficient to nullify any duty to warn. Id. at 762. The expanded record shows that the state of the parents' knowledge is strongly disputed.

¶ 47. A second reason for finding a duty to warn in this case is that E.R.'s parents fell within the "zone of danger" from E.R.'s conduct. While there is no allegation that E.R. ever threatened his parents, plaintiffs' complaint alleged that by failing to warn the parents, the "Brattleboro Retreat needlessly endangered the safety of third parties, including, not limited to the Plaintiffs." Moreover, it is alleged that E.R. specifically threatened his caretakers, and the parents were to become his caretakers after his discharge from the Retreat.

24

¶ 48.    The duty to warn those in the zone of danger was addressed by the Arizona Supreme Court in a case very similar to this one.  See Hamman v. Cty. of Maricopa, 775 P.2d 1122, 1123 (Ariz. 1989).  In Hamman, the patient was brought to an emergency psychiatric center because of violent and other "abnormal behavior."  His parents expressed fear that he "would either be killed or kill somebody" and reported that they maintained constant supervision over him.  Id.  After speaking with a doctor, the doctor refused to admit the patient to the hospital, but prescribed medication and advised his mother to take him to follow-up care at a medical center.  Id. at 1124.  One morning, the patient refused to take his medicine.  Later that day, he attacked his father with an electric drill.

¶ 49.    The parents filed a claim against the hospital for negligence, claiming that the doctor owed them a duty to reasonably diagnose and treat their son's condition and that they reasonably relied upon the doctor's advice that their son was harmless.  In assessing the scope of the duty, the court rejected the narrow approach of requiring an identifiable victim but also cautioned against adopting a rule that is "too inclusive, subjecting psychiatrists to an unreasonably wide range of potential liability."  Id. at 1127.  The court concluded:

> If indeed [the doctor] negligently diagnosed [the patient] as harmless, the most likely affected victims would be [his parents]. Their constant physical proximity to [the patient] placed them in an obvious zone of danger.  [His parents] were readily identifiable persons who might suffer harm if the psychiatrist was negligent in the diagnosis or treatment of the patient.  The fact that [the patient] never verbalized any specific threats against [his parents] does not change the circumstances that, even without such threats, the most likely victims of the patient's violent reaction would be [his parents].

Id. at 1128 (emphasis added); see also Div. of Corr. v. Neakok, 721 P.2d 1121 (Ala. 1986), overruled on other grounds by Dep't of Corr. v. Cowles, 151 P.3d 353 (Ala. 2006) (finding that state agencies had duty to warn residents of small community of parolee's dangerous propensities, particularly victims, as one was foreseeable and others were in zone of danger).  We find Hamman persuasive and follow its reasoning.

¶ 50.    In recognizing a duty to warn, we distinguish this case from Thompson, where the mother of the juvenile offender was not foreseeably endangered, as the offender's threats were to children. By contrast, E.R.'s parents were in the zone of danger, as E.R.'s dangerous propensities were not targeted towards any one class of individuals. If E.R. had harmed his parents, we may have easily concluded that the Retreat owed them a duty to warn of his violent tendencies; if he directed violence towards a member of the general public, the question becomes harder. If defendant owed a duty to the parents and breached that duty, resulting in harm to an unidentifiable third party, is defendant liable?

¶ 51.    To answer this question, we look to cases involving a physician's duty to warn a patient, the breach of which results in injury to a third party. Most courts have recognized that physicians owe a duty to their patients to warn them about the hazards of driving on certain medications and that, when the physician breaches that duty, causing harm to a third party, he or she is liable for that failure to warn. See, e.g., Taylor v. Smith, 892 So. 2d 887, 893-94, 896 (Ala. 2004) (holding that duty of care owed by physician to his patient "extends to third-party motorists who are injured in a foreseeable automobile accident with the patient that results from the [physician's] administration of methadone" and citing cases from Maine, Michigan, New Mexico, Oregon, Texas, and Wisconsin that have imposed similar duty to warn); see also Restatement (Third) of Torts § 41 cmt. h. But see Jarmie v. Troncale, 50 A.3d 802, 810 (Conn. 2012) (holding that physicians owe no duty to warn patients not to drive for benefit of third parties because "Connecticut precedent does not support it, the plaintiff was an unidentifiable victim, public policy considerations counsel against it, and there is no consensus among courts in other jurisdictions, which have considered the issue only rarely"). We conclude, based on existing precedent and modern trends in negligence law, that the Retreat had a duty to warn E.R.'s parents as individuals in the "zone of danger" of E.R.'s dangerous propensities.[7]

---

[7] Again, we do not adopt Restatement (Third) of Torts § 41(b)(4) to support this holding.

26

¶ 52.   This duty on which we base this decision is a narrow one, and applies only when a caregiver is actively engaging with the patient's provider in connection with the patient's care or the patient's treatment plan (or in this case discharge plan), the provider substantially relies on that caregiver's ongoing participation, and the caregiver is himself or herself within the zone of danger of the patient's violent propensities.[8]  It does not require health care providers to seek out a caretaker for the patient to whom they can impart this information; nor does it require physicians to make disclosures to family members or others who may live with the patient but are not engaged with the patient's treatment and are not factored into the patient's treatment plan.

¶ 53.   As we noted above, plaintiffs' complaint alleges two separate duties—a duty to warn and a duty to train.  The complaint described the duty to warn as a duty to inform E.R.'s parents that "he posed a risk to the public including themselves."  It described the duty to train as the duty to instruct the parents "to supervise him, how to monitor and manage his medications intake, to effectively recognize when medications were being avoided and to effectively respond so that measures necessary and appropriate to protect potential victims could be implemented."  The duty to warn as we have described it above contemplates more than simply advising the parents that their son posed a risk; it may also entail a duty to provide reasonable information to enable the parents to fulfill the role envisioned for them in the treatment plan to help keep their son safe.  The specific nature and content of that information is case-specific, and a question of fact.  In that sense, the duty to "warn" may be better described as a duty to "inform" that incorporates some elements of what plaintiffs describe as a distinct duty to "train."

¶ 54.   However, we find the amorphous concept of a "duty to train" as a distinct cause of action unworkable, and note that such a duty, in contrast to the duty to warn as we have described

---

[8]  At the same time as we stress the narrowness of the duty we recognize to decide this case, we emphasize our recognition that neither Peck nor Tarasoff decided whether a duty would be present based on facts and claims not in those cases.  It is the nature of development of the common law that we do not address whether a duty can arise in circumstances not before us.

27

it, lacks grounding in existing caselaw. For these reasons, we decline to recognize a distinct cause of action for failure to "train" E.R.'s parents.

¶ 55. We have initially analyzed the duty to inform with respect to the Retreat. Plaintiffs' complaint alleges a similar duty to warn with respect to NKHS. Although the two entities had different responsibilities, we see no reason to differentiate between them in defining the duty that each owed. Thus, we hold that NKHS had the same duty to warn, recast above as including a duty to provide particular information, as the Retreat did.

¶ 56. As we discussed briefly above, defendants also allege that plaintiffs' duty-to-inform counts should be dismissed because plaintiffs cannot show the element of causation. Duty is a legal question, and is therefore appropriate for our consideration on an appeal from a motion to dismiss. We cannot say the same about the element of causation. Until there is factual development on the extent to which defendants may have fallen short of their duty, if any, and were negligent in doing so, we cannot determine whether plaintiffs can meet their burden of showing that defendants' negligence was a proximate cause of plaintiffs' damages. We cannot dismiss the complaint based on the absence of causation.

¶ 57. Finally, as to the duty to warn or inform, we must address the confidentiality arguments raised in the briefs of defendant NKHS and amici curiae Vermont Council of Developmental and Mental Health Services, Inc., Disability Rights of Vermont, Inc., and the Vermont Association of Hospitals and Health Systems. Defendant NKHS and amici curiae argue that expansion of the standards under which psychotherapists must disclose protected health information without consent beyond those imposed in Peck violates state and federal law and contrary to policy goals of encouraging individuals to seek mental health treatment. In particular, defendant and amici curiae note that Vermont has codified the physician-patient privilege in 12 V.S.A. § 1612(a), which precludes the disclosure of confidential information absent patient permission or authorization from an express provision of law. Amici curiae argue that while Peck modified § 1612 to require disclosure when a mental patient has threatened "serious harm to an

identified victim," 146 Vt. at 67, 499 A.2d at 426, no express provision of Vermont or federal law permits disclosure under the broad terms of Restatement (Third) of Torts § 41(a)—also urged by plaintiffs—when a patient poses "risks" to the safety of the public at large.

¶ 58. Amici curiae also note that other Vermont statutes, particularly 18 V.S.A. § 1852(a)(7) and § 7103, protect from disclosure clinical information identifying current or former hospital patients. See id. § 7103(a) ("All certificates, applications, records, and reports . . . directly or indirectly identifying . . . an individual whose hospitalization or care has been sought or provided under this part, together with clinical information relating to such persons shall be kept confidential and shall not be disclosed by any person"); id. § 1852(a)(7) ("The patient has the right to expect that all communications and records pertaining to his or her care shall be treated as confidential. Only medical personnel, or individuals under the supervision of medical personnel, directly treating the patient, or those persons monitoring the quality of that treatment . . . shall have access to the patient's medical records."). Finally, amici curiae suggest that an expansion of the duty to warn would violate the confidentiality provisions established in the Privacy Rule adopted pursuant to the Health Insurance Portability and Accountability Act (HIPAA), 42 U.S.C. § 1320d et seq., which applies to the information acquired by community mental health agencies across the United States and which is exempt from any public policy exception created by this Court.[9]

¶ 59. We recognize that although defendants and amici have accepted Peck's disclosure requirements as a baseline beyond which we cannot go, that decision gave very limited consideration to binding confidentiality requirements. The Peck Court noted that the Legislature

---

[9] In its brief to this Court, amicus curiae The Vermont Association of Hospitals and Health Systems also notes that under section five of the American Medical Association's (AMA) Code of Medical Ethics, disclosure of confidential information is permitted only when a patient "threatens to inflict serious physical harm to another person or to him or herself and there is a reasonable probability that the patient may carry out the threat." Code of Ethics of the American Medical Association, Opinion 5.05 (2014-2015), https://perma.cc/5QPE-HYU3. We are mindful however, of the fact that ethical standards, whether promulgated by the AMA, the Vermont Medical Society, or Vermont Psychiatric Association, are "aspirational in nature and not enforceable by law." Bryson v. Tillinghast, 749 P.2d 110, 114 (Okla. 1988); accord Caldwell v. Chauvin, 464 S.W. 3d 139, 156 (Ky. 2015).

29

had created certain exceptions to the statutory patient's privilege and that an exception similar to that sought for mental health professionals to warn identified potential victims existed for lawyers and, consequently, created by judicial decision an exemption for mental health professionals. 146 Vt. at 67-68, 499 A.2d at 426. To ensure that the disclosure requirements we have adopted fully comply with confidentiality requirements, we are reexamining the issue here rather than relying upon Peck.

¶ 60. Our conclusion is that the aforementioned statutes and regulations do not bar plaintiffs' failure-to-inform cause of action in this case for three reasons. First, while it is true that 12 V.S.A. § 1612 and the more comprehensive Vermont Rule of Evidence 503 prevent physicians from disclosing health information or history, the statute codifies an evidentiary privilege, thus limiting its application to judicial proceedings. See Steinburg v. Jensen, 534 N.W.2d 361, 370 (Wis. 1995) ("The physician-patient privilege is a testimonial rule of evidence, not a substantive rule of law regulating the conduct of physicians."). As such, the privilege does not preclude the Retreat from warning E.R.'s parents of E.R.'s likelihood of violent actions.[10] See 1 McCormick on Evid. § 72.1 (7th ed.) ("[T]rue rules of privilege operate generally to prevent revelation of confidential matter within the context of a judicial proceeding . . . . [They] do not speak directly to the question of unauthorized revelations of confidential matter outside the judicial setting, and redress . . . must be sought in the law of tort or professional responsibility." (footnotes omitted)).[11]

---

[10] Peck accepted, without analysis, that 12 V.S.A. § 1612(a) prohibited disclosure outside of judicial proceedings and held that the privilege could be waived "under appropriate circumstances" by judicial decision. Peck, 146 Vt. at 67, 499 A.2d at 426. As the text states, the statute does not prevent a mental health professional from disclosing patient information as part of a warning to the patient's family because this is not an in-court disclosure. We do not consider whether a waiver of the privilege, if it applied, is possible and appropriate.

[11] The defendants, and amicus curiae who support their position, have raised in their re-argument motions potential sources of restrictions on disclosure not identified in the presentations to the trial court or to this Court in the briefs. We have considered them in the interest of fully reflecting the effect of disclosure restrictions on the duty in this case. We do not consider whether a duty of confidentiality between a patient and mental-health professional arises from any other source. See, e.g., Schuster, 424 N.W.2d at 171 (noting that exception to psychotherapist-patient privilege is limited to evidentiary setting and exploring physicians' broader ethical duty of

¶ 61. Second, the confidentiality statutes cited by amici curiae are not inconsistent with the disclosures required by the duty described here. One statute sets forth a "bill of rights" for patients who are admitted to a hospital on an inpatient basis. Among other things, it states that "[t]he patient has the right to expect that all communications and records pertaining to his or her care shall be treated as confidential" except when authorization is provided. 18 V.S.A. § 1852(a)(7). Further, it recognizes a patient's right to privacy and provides that case discussions are confidential and "[t]hose not directly involved in the patient's care must have the permission of the patient to be present." Id. § 1852(a)(6). The duty recognized in this decision—to provide certain information to a caregiver actively engaged in the patient's care and treatment plan—is not at odds with these protections, which prevent disclosures to those not directly involved in the patient's care without the patient's permission. Likewise, the mental-health statute, 18 V.S.A. § 7103(b), explicitly states that "[n]othing in this section shall preclude disclosure . . . of information concerning medical condition" to certain individuals including the person's family, clergy, health care agent, or "an interested party." Again, if the duty applies, it will be to provide information to an interested individual whose ongoing participation in the patient's care is part and parcel of the patient's treatment plan.

¶ 62. Finally, the federal regulations governing HIPAA's Privacy Rule, relied upon by amici, also carve out two exceptions relevant to the disclosure obligation imposed in this decision. The first is a dangerous patient exception to the confidentiality requirement intended to "avert a serious threat to health or safety":

> (1) Permitted disclosures. A covered entity may, consistent with applicable law and standards of ethical conduct, use or disclose protected health information, if the covered entity, in good faith, believes the use or disclosure:

confidentiality"); Sorensen v. Barbuto, 2008 UT 8, ¶ 17, 177 P.3d 614 (distinguishing physician's duty of confidentiality from physician-patient testimonial privilege and recognizing a "healthcare fiduciary duty of confidentiality").

> (i)(A) is necessary to prevent or lessen a serious and imminent threat to the health or safety of a person <u>or the public</u>; and
>
> (B) is to a person or persons reasonably able to prevent or lessen the threat.

45 C.F.R. § 164.512(j) (emphasis added). In this case, the disclosure requirement is imposed to avert a serious threat to health or safety and under circumstances that meet the specific language of (i)(A) and (B). The second exception is for emergency circumstances, allowing limited use and disclosures:

> If the individual is not present, or the opportunity to agree or object to the use or disclosure cannot practicably be provided because of the individual's incapacity or an emergency circumstance, the covered entity may, in the exercise of professional judgment determine whether the disclosure is in the best interests of the individual and, if so, disclose only the protected health information that is directly relevant to the [family member, other relative, or close personal friend's] involvement with the individual's care or payment related to the individual's health care.

Id. § 164.510(b)(3); see also Office for Civil Rights, A Health Care Provider's Guide to the HIPAA Privacy Rule: Communicating with a Patient's Family, Friends, or Others Involved in the Patient's Care 2, https://perma.cc/9596-MXWK.

¶ 63. As discussed above, plaintiffs' complaint alleges sufficient facts to indicate that the Retreat was well aware of E.R.'s propensity for violence, particularly when off his medication, and that E.R.'s parents likely underestimated the degree of danger E.R. posed to his caretakers and to the public. Similarly, it is evident from the facts that E.R. was sufficiently incapacitated such that disclosure could not be practicably authorized and that information about his condition and violent behavior would have been "directly relevant" to the care his parents provided him. We recognize that both of these subsections permit, rather than mandate, unauthorized disclosure in the aforementioned instances, as well as that both predicate the admissions in the medical entity's good faith belief and professional judgment that disclosure was necessary. In essence, by this decision, we are imposing the mandate as a matter of tort law in circumstances where the mental health professionals and institution are authorized, but not obligated, to disclose under HIPAA.

32

¶ 64.    In reaching our decision, we recognize the "interest in safeguarding the confidential character of psychotherapeutic communications" as argued by the dissent. Post, ¶ 90. We are bound by the direction of Peck: "In the same manner that due care must be exercised in the therapist's determination of what steps may be necessary to protect the potential victim of a patient's threat of harm, so too must due care be exercised in order to ensure that only that information which is necessary to protect the potential victim is revealed." 146 Vt. at 68, 499 A.2d at 426-27. Based on the above analysis, we hold that both the Retreat and NKHS had a duty to provide information to E.R.'s parents, both to warn them of E.R.'s risk of violence to themselves and others and to provide them reasonable information to enable them to fulfill their role in keeping him safe. We stress that we are only defining the duty owed by the mental health services providers, and allowing this action to proceed to determine whether defendants breached their duties, and if so, were negligent in doing so. We reverse the dismissal of Counts II, III and V of plaintiffs' complaint and remand for those counts to proceed.

### III.  Duty to Protect

¶ 65.    We next consider plaintiffs' other counts, starting with those against the Retreat. The complaint contains two additional counts with respect to this defendant: (1) that defendant negligently discharged E.R. and this discharge was the proximate cause of plaintiffs' damages; and (2) defendant undertook to render a service to E.R. necessary to protect third parties, failed to exercise due care in the performance of its undertaking, and its negligence was a proximate cause of the damages to plaintiffs. Plaintiffs allege these counts relying upon the general duty expressed in Tarasoff and Peck and the duty described in § 41(b)(4) of the Restatement (Third) of Torts. With respect to the second of these duties—that is, to exercise due care in the performance of an undertaking—plaintiffs also rely on § 324A of the Restatement (Second) of Torts.[12]

_____

[12]  This duty is also contained in the Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 43(a).

¶ 66. Relying principally on our decision in Sorge, the Retreat argues that these duties do not exist or do not apply here. We begin with the sources of law as argued by the parties.

¶ 67. We look first at Sorge, the most relevant of our precedents. In Sorge, one of the plaintiffs was injured after being assaulted by a juvenile offender who was in the custody of the Vermont Department of Social and Rehabilitation Services (SRS). The victim and his wife filed suit against the State, alleging that SRS was negligent in failing to adequately supervise and control the juvenile and that, as a result of the negligence, the victim sustained injuries. The plaintiffs claimed that SRS was aware of the juvenile's "history of violent, assaultive and delinquent behavior," but that SRS nonetheless placed him in the temporary custody of his mother for the weekend and she "was either unlikely or incapable of adequately supervising him." Sorge, 171 Vt. at 173, 762 A.2d at 818.

¶ 68. We began by summarizing the factors to be considered in determining whether a governmental body has a duty of care to a specific person, beyond its duty to the public at large:

> (1) whether an ordinance or statute sets forth mandatory acts clearly for the protection of a particular class of persons, rather than the public as a whole; (2) whether the government has actual knowledge of a condition dangerous to those persons; (3) whether there has been reliance by those persons on the government's representations and conduct; and (4) whether failure by the government to use due care would increase the risk of harm beyond its present potential.

Id. at 174, 762 A.2d at 819. The plaintiffs conceded that there was no specific statutory provision mandating protection for the victim or any other particular class of persons, arguing instead that because SRS's failure to control the juvenile resulted in harm, liability should be imposed on the State. The plaintiffs further contended that § 319 of the Restatement (Second) of Torts creates an exception for "persons having dangerous propensities" that extends beyond the duty to warn and imposes an obligation to control an offender for the protection of the public. This section provides: "One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm." Restatement (Second) of Torts § 319. Thus,

34

the section creates an exception for cases where a "special relationship" exists between the State and the juvenile.

¶ 69. We rejected both arguments. We found the first theory at odds with the principle espoused in both Peck and Restatement (Second) of Torts § 315 that "[g]enerally, there is no duty to control the conduct of another in order to protect a third person from harm." Sorge, 171 Vt. at 176, 762 A.2d at 819. We also found the "special relationship" theory to be inconsistent with the goals of rehabilitation and reunification underlying both juvenile and adult detention programs. Id. at 177-78, 762 A.2d at 820-21; see also Rivers v. State, 133 Vt. 11, 14, 328 A.2d 398, 400 (1974) (emphasizing rehabilitative goals of release of inmates on probation or parole, and stating that liability premised on duty of State to third parties harmed during inmate's release on weekend pass "runs dangerously parallel to the arguments for preventative detention that represent an overriding of constitutional limitations"); Finnegan v. State, 138 Vt. 603, 606, 420 A.2d 104, 105 (1980) (holding that escaped prisoner's negligence cannot be transferred to State). We further observed that the § 319 exception had been rejected by a number of other states "that have recognized that most juvenile and adult programs dealing with persons committed to the custody of the State are intended to rehabilitate conduct rather than control it." Sorge, 171 Vt. at 177-78, 762 A.2d at 820-21.

¶ 70. Importantly, we stated that for § 319 to apply, the State's purpose in assuming custody of an individual "must explicitly be to control that person" and that "attempts to exercise that control must be consistent with the specific objective of insulating a person having dangerous propensities from uncontrolled contact with others whom the State knows or has reason to know are likely to be harmed by the person the State intends to isolate." Id. at 180, 762 A.2d at 822-23. This is true for both public entities, like those at issue in Peck and Sorge, as well as private institutions, like defendants here. See id. at 178, 762 A.2d at 821.

¶ 71. Returning to plaintiffs' theory of duty and liability in this case, we can find no jurisdiction that has adopted Restatement (Third) of Torts § 41(b)(4). The Reporter's Notes to

35

§ 41(b)(4) cite cases from seven jurisdictions that have adopted a duty commensurate with that in § 41(b)(4) and broad enough to support the counts included in plaintiffs' complaint here. As defendant points out, many of these decisions have been superseded by statutes that narrow the duty.[13] Two cases in particular are helpful to understanding arguments for a broad expression of duty.

¶ 72.   The first is Perreira v. State, 768 P.2d 1198 (Colo. 1989), a 4-3 decision from the Colorado Supreme Court. In that case, a police officer was shot and killed by a former mental patient who had been recently released from involuntary commitment to a mental institution. The officer's spouse brought a wrongful death action against the state, the psychiatric hospital, and the treating psychiatrist, alleging that the psychiatrist was negligent in releasing the patient. The court held that:

> [W]hen, as here, a staff psychiatrist of a state mental health facility is considering whether to release an involuntarily committed mental patient, the psychiatrist has a legal duty to exercise due care, consistent with the knowledge and skill ordinarily possessed by psychiatric practitioners under similar circumstances, to determine whether the patient has a propensity for violence and would thereby present an unreasonable risk of serious bodily harm to others if released from the involuntary commitment, and, further, that in discharging this legal duty the psychiatrist may be required to take reasonable precautions to protect the public from the danger created by the release of the involuntarily committed patient, including the giving of due consideration to extending the term of the patient's commitment or to placing appropriate conditions and restrictions on the patient's release.

Id. at 1200. The court reached that result primarily by relying upon §§ 315 and 319 of the Restatement (Second) of Torts. Id. at 1208-09, 1211. The court also concluded that given the psychiatrist's knowledge of the patient's condition and conduct, predictions of future dangerousness were within the professional's expertise to a reasonable standard of accuracy. Id. at 1216-17. The court recognized the patient's loss of liberty from commitment but did not

---

[13]   The presence of superseding statutes in many jurisdictions has made many judicial decisions irrelevant to the current law such that the subject is now controlled primarily by legislation.

conclude that the liberty loss should be elevated above the safety of others. Id. at 1217-18. It found the duty of care to third parties consistent with that otherwise imposed on a mental health professional. Id. at 1218-19. Finally, it rejected the claim that the duty is inconsistent with the requirement that institutionalization be used only when all lesser-restrictive alternatives are inadequate, as well as the argument that it would lead to over-commitment by mental health professionals to avoid tort liability. Id. at 1219-20.

¶ 73. In Estates of Morgan, the Ohio Supreme Court, also by a 4-3 decision, reached the same result in the context of a voluntary outpatient who had received therapy and medication from a community mental health center and thereafter shot and killed his parents and injured his sister. The plaintiffs alleged the mental health professionals were negligent in the treatment they provided. The court relied upon Restatement (Second) of Torts §§ 315 and 319 and Tasaroff in finding a broad duty. 673 N.E.2d at 1319-22. The court found that the defendants had sufficient control over the patient's behavior in the outpatient setting—or could acquire that control—to support a broad duty of care. Id. at 1323-25. It found that although mental health professionals encounter difficulty in predicting dangerousness, the standard of care is based on their ability to do so with limitations. Id. at 1325. It also found, as the court did in Perreira, that the duty of care would not lead to excessive institutionalization of patients. Id.

¶ 74. The decisions contrary to Perreira and Morgan tend to rely upon the possible adverse consequences of recognizing a duty. The opposing arguments are captured in a quote from Sherrill v. Wilson, 653 S.W.2d 661, 664 (Mo. 1983), a case in which a patient was given a two-day pass from a mental institution, during which he shot another person:

> The treating physicians, in their evaluation of the case, well might believe that [the patient] could be allowed to leave the institution for a prescribed period and that his release on pass might contribute to his treatment and recovery. We do not believe that they should have to function under the threat of civil liability to members of the general public when making decisions about passes and releases. The plaintiff could undoubtedly find qualified psychiatrists who would testify that the treating physicians exercised negligent judgment, especially when they are fortified by hindsight. The

37

> effect would be fairly predictable. The treating physicians would indulge every presumption in favor of further restraint, out of fear of being sued. Such a climate is not in the public interest.

See also Restatement (Third) of Torts § 41 cmt. g (quoting Sherrill). We look to two decisions that specifically reject the holdings of Perreira and Morgan to explain this rationale.

¶ 75. In Leonard v. State, 491 N.W.2d 508 (Iowa 1992), which specifically rejected the holding of Perreira, the court applied § 319 of the Restatement (Second) of Torts, but held that it created a duty to protect only "reasonably foreseeable victims" and not members of the public generally. Id. at 511. The Iowa Supreme Court quoted Sherrill and indicated concern about the "limitless liability" created if the mental health professional's duty extended to the public generally, concluding that the victim's interest is outweighed by the harm to the public if "physicians were subject to civil liability for discharge decisions." Id. at 512. The Iowa high court also concluded that liability for discharge of a patient would chill the physician's decision-making and threaten the integrity of the civil commitment system. Id.

¶ 76. In Adams v. Board of Sedgwick County Commissioners, 214 P.3d 1173 (Kan. 2009), which reinforced an earlier decision of the Kansas Supreme Court, Boulanger v. Bol, 900 P.2d 823 (Kan. 1995), the court specifically rejected the Ohio Supreme Court's holding in Morgan. In Boulanger, the Kansas high court had concluded that a mental health professional has no duty to third parties who are injured by an attack from a released voluntary patient, and no duty to initiate an involuntary commitment proceeding. Adams, 214 P.3d at 1184 (citing Boulanger, 900 P.2d at 823). The court in Adams reiterated this holding, particularly differing with the Morgan analysis that the duty to the patient and the duty to third parties are the same. Id. It also expressed concern as to whether the policy of holding patients in the least restrictive environment would be consistent with a broad liability rule. Id.

¶ 77. Here, the parties' arguments, joined by amicus curiae representing the mental health provider community, mirror the arguments in the cases described above. The briefs provide us with cites to, and excerpts from, articles and studies that support or oppose the claim that mental

health provider liability of the type sought here will cause an increase in unjustified commitments and abandonment of treatment-in-the-least-restrictive-environment requirement, as well as the claim that mental health professionals cannot predict dangerousness with sufficient accuracy to act on their prediction. While these studies inform our decision, we do not find sufficient consensus to act primarily on them. They do suggest, however, that whatever decision we reach in this case, the liability issues are appropriate for legislative action, as has happened in many other states, to consider more thoroughly the policy arguments and evidence.

¶ 78. Returning to the parties' arguments, both plaintiffs and defendants contend that we have essentially decided this case with respect to the duty not to release, with plaintiffs relying upon the broad statement of duty in Peck and defendants relying upon the limitations on duty imposed by Sorge. We conclude that defendants have the stronger support of this aspect of the arguments. It would be difficult for us to reconcile the holding in Sorge with a holding that the Retreat had a duty not to release E.R. as a matter of public protection. In saying this, we specifically reject reliance on the Restatement (Third) of Torts § 41(b)(4)'s special rule for mental health professionals. We conclude that if mental health professionals have a broad duty of public protection to institutionalize patients who may be dangerous, child protection workers would have a similar duty to institutionalize a juvenile who may be dangerous to the public. Our decision in Sorge rejects such a duty.

¶ 79. We are also reluctant to impose on mental health professionals a duty to third persons generally to seek to prevent the release of a voluntary patient. We are concerned by the broad scope of such a duty and its consequences on the mental health system. See 18 V.S.A. § 7251(3); In re R.L., 163 Vt. 168, 173, 657 A.2d 180, 184 (1995) (stating that this Court requires consideration of voluntary alternatives first before resorting to involuntary order because involuntary treatment for mental illness is massive curtailment of liberty often resulting in social stigmatization). In Sorge, we recognized the conflict between the state's obligation to rehabilitate the juvenile involved and the obligation to protect the public. 171 Vt. at 177, 762 A.2d at 820.

39

We resolved that conflict decisively in favor of rehabilitation in a noninstitutional setting. Consistent with Sorge, we must resolve the conflict in the same way here. Thus, we elect not to impose a duty.

¶ 80. We also reject on narrower grounds plaintiffs' claim that defendant Brattleboro Retreat can be liable for negligent performance of an undertaking under § 324A of the Restatement (Second) of Torts. That section requires plaintiffs to show one of three circumstances. The only one possibly applicable in this case is § 324A(a): that defendants' "failure to exercise reasonable care increases the risk of such harm." The standard of comparison for this subsection is not the risk of harm created if defendant exercised reasonable care, as under that standard the element would always be met. Instead, the standard is the risk of harm that would be present if defendant never undertook to render the services. Plaintiffs cannot show, and do not allege, that defendant's care increased the risk to third persons. Sentry v. Murphy Ins., 2014 VT 25, ¶ 28, 196 Vt. 92, 95 A.3d 985.[14] Therefore, § 324A does not apply.

¶ 81. Finally, our holding on these counts of the complaint against the Retreat apply equally against NKHS, the outpatient service provider. Indeed, courts have held that duties to control are lesser in outpatient programs because the ability to control the behavior of the patient is more limited. See Santana v. Rainbow Cleaners, 969 A.2d 653, 665-66 (R.I. 2009). Plaintiffs alleged in Count VI that NKHS had a duty to treat E.R. such that the risk of harm to the public would be reduced. We decline to impose such a duty. For the reason expressed above with respect to the Retreat, we hold that Restatement (Second) of Torts § 324A does not impose a duty to the public on NKHS to exercise reasonable care in its undertaking to provide services to E.R.

¶ 82. We emphasize the narrowness of our ruling today. The question before us in connection with this motion to dismiss is whether we can conclude beyond doubt that "there exist

_____

[14] This point is now explicitly recognized in the comparable section of the Restatement (Third) of Torts § 43.

no facts or circumstances that would entitle the plaintiff to relief." Bethel v. Mount Anthony Union High Sch. Dist., 173 Vt. 633, 634, 795 A.2d 1215, 1217 (2002) (mem.) (quotations omitted). Even applying this liberal standard, we have concluded that defendants had no duty enforceable by a third party to treat E.R., to seek involuntary commitment of E.R., or to adopt a particular discharge plan. The only potential duty we recognize in this case, as in Peck, involves a duty to provide certain information in a specific class of cases. That duty applies when a caregiver is actively engaging with the patient's provider in connection with the patient's care, the patient's treatment plan (or in this case, discharge plan) substantially relies on that caregiver's ongoing participation, and the caregiver is himself or herself within the zone of danger of the patient's violent propensities.[15] The information to be conveyed is reasonable information to notify the caregiver of the risks, and of steps he or she can take to mitigate the risks. This duty is, in turn, limited by HIPAA and any other applicable statute restricting such disclosures. A provider has no duty to convey any information in violation of HIPAA.[16]

¶ 83. We also note the significant obstacles this and similar claims face. In addition to proving the necessary facts to establish the limited duty recognized above, plaintiffs here will have to establish the content of the reasonable disclosure, and a failure to provide that information. Not only must plaintiffs prove duty and breach, they will have to prove causation—that any failure to inform they can prove was more likely than not a but-for cause of their injuries.

¶ 84. In summary, we hold that counts II and V of plaintiffs' complaint (the "failure to warn" counts), as construed to include elements of count III (the "failure to train" count that was

---

[15] The caregiver need not be formally charged with legal responsibility for the patient, as in a guardianship. The fact that the treatment plan relies on the participation of the caregiver, even if the caregiver has no legal responsibility for or authority over the patient, is sufficient to trigger a duty to inform.

[16] Exceptions to the general rule of nondisclosure under HIPAA may include disclosures the provider believes in good faith are necessary to prevent or lessen a serious and imminent threat to the health or safety of a person or the public to a person reasonably able to lessen that threat, 45 C.F.R. 164.512(j), as well as information conveyed with the patient's consent or pursuant to a valid authorization. Id. § 164.506(b) (consent); id. § 164.508(a) (authorization).

otherwise properly dismissed) state causes of action that survive a motion to dismiss. In all other respects, the motion to dismiss was properly granted. As discussed in the foregoing paragraphs, we do not adopt § 43 of the Restatement (Third) of Torts.

Affirmed on plaintiffs' failure-to-treat and negligent-undertaking claims. Reversed and remanded on the failure-to-inform claims.

FOR THE COURT:

_____

Associate Justice

¶ 85. **REIBER, C.J., dissenting.** Chief Justice Roger Traynor of the California Supreme Court, one of the great common-law innovators in American legal history, nevertheless repeatedly cautioned restraint, or what he called "circumspection," in the evolution of judicial precedent. "The greatest judges of the common law have proceeded in this way," he explained, "moving not by fits and starts, but at the pace of a tortoise that explores every inch of the way, steadily making advances though it carries the past on its back."[17] Unlike a legislature, whose scope of inquiry is unbounded, an appellate court is confined to the record, which in turn is limited by the rules of evidence, and its decisions—unlike statutes—become instantly resistant to change under the rule of stare decisis. Hence the overarching need for judicial humility in the face of our own limited knowledge—for incremental rulings that allow a court "time to advance or retreat" from its forays into the unknown with a minimum of unintended effects and needless shock to those who must "act in reliance upon judicial pronouncements."[18]

¶ 86. The majority abandons this cautious approach with no apparent awareness that it is even doing so. It dresses its decision in the clothes of the "modern," suggesting that its holding flows from a natural "evolution of the duties articulated in decades of case law" and thus represents

---

[17] R. Traynor, <u>Transatlantic Reflections on Leeways and Limits of Appellate Courts</u>, 1980 Utah L. Rev. 255, reprinted in The Traynor Reader 200 (1987).

[18] Traynor, <u>supra</u>, at 200.

42

no dramatic departure. Ante, ¶¶ 21, 23, 38. It embraces these "precedent[s] and modern trends" to define for mental-health care providers a new common-law duty. Ante, ¶ 51.

¶ 87. But the argument is a fiction. Science and the law have indeed evolved in the forty years since the California Supreme Court's seminal decision in Tarasoff v. Regents of University of California that a therapist who "determines, or pursuant to the standards of his profession should determine, that his patient presents a serious danger of violence to another, . . . incurs an obligation to use reasonable care to protect the intended victim against such danger." 551 P.3d 334, 340 (Cal. 1976). They have simply not evolved in any way that remotely supports the majority's decision to expand exponentially the duty owed by a mental health professional to protect third parties in the circumstances presented here. Accordingly, I must respectfully dissent.

¶ 88. The majority observes at the outset that since Tarasoff "several courts have limited the duty to identifiable victims, or a class of individuals whose injury is foreseeable because of their relationship or proximity to a specifically identifiable victim." Ante, ¶ 36 (emphasis added). Among these, of course, is our own holding in Peck v. Counseling Service of Addison County, Inc. that "a mental health professional who knows or, based upon the standards of the mental health profession, should know that his or her patient poses a serious risk of danger to an identifiable victim has a duty to exercise reasonable care to protect him or her from that danger." 146 Vt. 61, 68, 499 A.2d 422, 427 (1985). "However," the majority continues, "several other courts have held that a duty to warn is owed not only to specifically identified or identifiable victims, but to foreseeable victims or to those whose membership in a particular class . . . places them within a zone of danger." Ante, ¶ 37. Combined with the suggestion that "Peck was decided thirty years ago, before modern trends in this area," ante, ¶ 38 (emphasis added), the implication is that the states are now about evenly divided between these camps.

¶ 89. This is decidedly not the case. The voluminous literature canvassing the legal and medical ramifications of Tarasoff over the past four decades agree that the predominant legal response has been to specifically define and limit a mental health provider's duty to protect third

43

parties, generally requiring a serious threat to a readily identifiable victim. See, e.g., D. Katner, Confidentiality and Juvenile Mental Health Records in Dependency Proceedings, 12 Wm. & Mary Bill of Rt. J. 511, 532 (2004) (Although "most jurisdictions now recognize a Tarasoff-type duty, the vast majority . . . limit it to situations in which . . . the patient has communicated to the psychotherapist a serious threat of physical violence against a reasonably identifiable victim or victims." (quotations omitted)); C. Cantu, et al., Bitter Medicine: A Critical Look at the Mental Health Care Provider's Duty to Warn in Texas, 31 St. Mary's L.J. 359, 377 (2000) ("The majority of states that have addressed this issue follow the Tarasoff/Thompson rule, which states that when a mental health care provider foresees or should foresee that a patent poses a serious risk of violence to a readily identifiable third person, a duty arises to use reasonable care to protect that individual against the danger.").[19] See also Fraser v. United States, 674 A.2d 811, 816 (Conn. 1996) (noting that "state courts . . . have overwhelmingly concluded that an unidentifiable victim has no claim in negligence against psychotherapists who were treating the assailant on an outpatient basis"); Eckhardt v. Kirts, 534 N.E.2d 1339, 1344 (Ill. App. Ct. 1989) (observing that, in "determin[ing] the legal duty of therapists to third persons, numerous courts have concluded that a therapist cannot be held liable for injuries inflicted upon third persons absent specific threats to a readily identifiable victim").[20]

---

[19]  In Thompson v. County of Alameda, 614 P.2d 728, 734 (Cal. 1980), the California Supreme Court clarified Tarasoff by explaining that a therapist's duty to protect arises only when the patient's intended victim is "readily identifiable." "[N]onspecific threats of harm against nonspecific victims" do not trigger the duty of care. Id. at 735.

[20]  As discussed more fully below, a few courts have expanded the duty slightly to include persons within a "zone of danger" who were sufficiently targeted by the patient even if not specifically threatened. See, e.g., Jablonski v. United States, 712 F.2d 391, 398 (9th Cir. 1983) (applying California law and Tarasoff to hold that, although defendant's patient had made no express threat against his domestic partner, Melinda Kimball, she was within scope of duty where patient's "previous history indicated that he would likely direct his violence against Kimball," his psychological profile "indicated that his violence was likely to be directed against women very close to him," and he had threatened Kimball's mother), overruled on other grounds by In re McLinn, 739 F.2d 1395 (9th Cir. 1984 (en banc); Hamman v. Cty. of Maricopa, 775 P.2d 1122, 1127-28 (Ariz. 1989) (holding that "Tarasoff envisioned a broader scope" of duty than circumstance where patient "verbalized [a] specific threat," and could include patient's family

44

¶ 90.    The reason is readily apparent.  Courts and legislatures from Tarasoff onward have recognized the conflicting interests at play in such cases and the freighted consequences however the balance is struck.  On one side is the obvious and compelling interest in protecting the public from assault by mental health patients with violent propensities.  On the other is the strong countervailing interest in safeguarding the confidential character of psychotherapeutic communications,[21] the inherent difficulty (often underappreciated by those with the luxury of hindsight) of forecasting future dangerousness,[22] and the significant societal concern that patients not be unnecessarily hospitalized as a means to avoid liability.[23]  See, e.g., Estates of Morgan v. Fairfield Family Counseling Ctr., 1997-Ohio-194, 673 N.E.2d 1311, 1322 (listing the factors

---

where his threats placed them "within the zone of danger, that is, subject to probable risk of the patient's violent conduct"); see also Fraser, 674 A.2d at 816 (noting that most courts have extended therapist's duty of care only to "victims who were either specifically identifiable or within a class of foreseeable victims").

[21]  See, e.g., D. Rosenhan, et al., Warning Third Parties: The Ripple Effects of Tarasoff, 24 Pac. L. J. 1165, 1222 (1993) (concluding, based on survey of mental health providers, that in accordance with Tarasoff "psychotherapists continue to warn patients that certain conversation is not confidential," and "in accord with expectation, many of these patients simply abandon treatment," posing additional risks to the public).

[22]  The clinical difficulties in (1) assessing the risk of violence posed by a patient and (2) determining whether that risk is sufficient to warrant protective actions, recognized in Tarasoff, have not appreciably lessened in the decades since.  See, e.g., D. Mossman, Critique of Pure Risk Assessment, or Kant Meets Tarasoff, 75 U. Cin. L. Rev. 523, 601-02 (2006) (explaining that clinicians do not "predict dangerousness" but simply identify different "levels of risk," and that more significantly few empirical studies reveal "what level of risk is sufficient to justify . . . action"); P. Herbert, The Duty to Warn: A Reconsideration and Critique, 30 J. Am. Acad. of Psychiatry & Law 417, 421 (2002) (observing that, "despite advances in risk assessment," such assessments fall "substantially short of exact science" and involve at best "approximations of the degree of risk").

[23]  This concern was cogently summarized by the court in Sherrill v. Wilson, 653 S.W.2d 661, 664 (Mo. 1983):

> The plaintiff could undoubtedly find qualified psychiatrists who would testify that the treating physicians exercised negligent judgment, especially when they are fortified by hindsight.  The effect would be fairly predictable.  The treating physicians would indulge every presumption in favor of further restraint, out of fear of being sued.  Such a climate is not in the public interest.

generally considered in determining a therapist's duty of care as including "the public's interest in safety from violent assault," the "difficulty inherent in attempting to forecast whether a patient represents a substantial risk of physical harm to others," the "goal of placing the mental patient in the least restrictive environment . . . free from unnecessary confinement," and the "social importance of maintaining the confidential nature of psychotherapeutic communications").

¶ 91.   A few states, weighing these countervailing concerns, have determined that public policy simply does not support the imposition of any duty upon a mental health care provider to protect third parties from a potentially violent patient.  See Boynton v. Burglass, 590 So. 2d 446, 448 (Fla. Dist. Ct. App. 1991) (rejecting Tarasoff-like duty to warn identified third parties of threats by patient on the ground that it is "neither reasonable nor workable and is potentially fatal to effective patient-therapist relationships"); Thapar v. Zezulka, 994 S.W.2d 635, 640 (Tex. 1999) (declining "to impose a common law duty on mental-health professionals to warn third parties of their patient's threats").

¶ 92.   Several other courts have taken the opposite tack, broadly defining the therapist's duty to include any "foreseeable" victim without limitation to specifically identified or identifiable targets of violence.  See Lipari v. Sears, Roebuck & Co., 497 F. Supp. 185, 194 (D. Neb. 1980); Naidu v. Laird, 539 A.2d 1064, 1072-73 (Del. 1988); Petersen v. State, 671 P.2d 230, 237 (Wash. 1983); Schuster v. Altenberg, 424 N.W.2d 159, 166 (Wis. 1988).  Significantly, however, these decisions have generally rested on the courts' recognition of a corollary duty to control a violent patient through involuntary commitment if necessary.  See Lipari, 497 F. Supp. at 193-94 (holding that therapist's duty includes "whatever precautions are reasonably necessary to protect potential victims of his patient," including "duty to detain a patient" in hospital); Naidu, 539 A.2d at 1073 (holding that defendants had duty to warn "and a duty to control the actions of a mentally ill patient" and were negligent in discharging patient from hospital); Petersen, 671 P.2d at 237 (upholding judgment for plaintiff based on psychiatrist's failure "to petition the court for a 90-day commitment, as he could have done . . . to protect those who might foreseeably be endangered");

46

Schuster, 424 N.W.2d at 166 (rejecting defendant's claim that they did not "have a duty to warn third parties or to institute proceedings for the detention or commitment of a dangerous individual for the protection of the patient or the public"). See generally M. Quattrocchi, Tarasaurus Rex: A Standard of Care that Could Not Adapt, 11 Psychol. Pub. Pol'y & L. 109, 113 (2005) ("Some courts have imposed a duty to third parties in the absence of an identifiable victim. These cases emphasize . . . protection in the form of hospital confinement."); R. Schopp, The Psychotherapist's Duty to Protect the Public: The Appropriate Standard and the Foundation in Legal Theory and Empirical Premises, 70 Neb. L. Rev. 327, 345 (1991) (noting that "the Schuster court interpreted warnings and civil commitment as comparable techniques for protecting the public from foreseeable harm").

¶ 93. Thus, those courts that have broadened the therapist's duty to all "foreseeable" victims without limitation have resolved the dilemma posed by the risk of over-commitment essentially by ignoring it; under these rulings, anyone injured by a mental health patient may argue that, in retrospect, the therapist was negligent in failing to detain the patient. In states like Vermont, however, where public policy militates against the recognition of a duty to control a patient through involuntary hospitalization—a policy reaffirmed by the majority today—extending the duty to the public at large is not a sound or practical option. See ante, ¶ 77 (rejecting imposition of duty to institutionalize mental health patient in order to avoid "an increase in unjustified commitments and abandonment of treatment-in-the-least-restrictive-environment" policy).

¶ 94. Most states, as noted, have pursued an approach between these two extremes. Through case law or legislation they have struck a balance among the competing concerns by recognizing a relatively narrow duty of care limited to situations where the therapist knows or should know that a patient poses a specific threat to an identified or reasonably identifiable third person. This standard, as one court has observed, "evinces a sound public policy against expanding the liability of health professionals to an indeterminate class of potential plaintiffs." Eckhardt, 534 N.E.2d at 1345. It reflects a considered policy judgment that the societal costs of breaching the

therapeutic bond based on generalized threats of violence—all too commonplace in the therapeutic setting[24]—do not justify whatever uncertain benefits may flow from expanding the duty to unspecified third parties based on an inherently inexact risk assessment made all the more difficult where the potential target is not identified. See, e.g., Thompson, 614 P.2d at 736 (observing that "it is fair to conclude that warnings given discreetly and to a limited number of persons would have a greater effect because they would alert [them] . . . of a specific threat pointed at them").

¶ 95.    This balancing of interests was cogently addressed by the Pennsylvania Supreme Court in considering "the conundrum a mental health care professional faces regarding the competing concerns of productive therapy, confidentiality and other aspects of the patient's wellbeing, as well as the interest in public safety." Emerich v. Phila. Ctr. for Human Dev., Inc., 720 A.2d 1032, 1040 (Pa. 1998).   In light of these concerns, the court concluded that the circumstances giving rise to a duty to third parties must necessarily be "limited," requiring "the existence of a specific and immediate threat" which is "made against a specifically identified or readily identifiable victim." Id. "Strong reasons," the court concluded, compel the conclusion that the therapist's duty "must have some limits." Id. Many other courts have echoed these concerns in reaching similar conclusions.  See, e.g., Fraser, 674 A.2d at 816 (adopting rule that therapist's duty to protect third persons is limited to identifiable victims or class of identifiable victims based on "balance [of] the interests of those injured by psychiatric outpatients against the interests of the mental health profession in honoring the confidentiality of the patient-therapist relationship and in respecting the humanitarian and due process concerns that limit the involuntary hospitalization of the mentally ill" (citation omitted)); Eckhardt, 534 N.E.2d at 873-74 (rejecting expansion of therapist's duty beyond "cases involving specifically identifiable, potential victims as evidenced by specific threats" because "[h]uman behavior is simply too unpredictable and the field of

---

[24]  See Herbert, supra, at 422 (explaining that "mental health workers must grapple with threats of suicide or of violence against others regularly as an integral part of their work," and that such threats "are daily grist")

48

psychotherapy presently too inexact," and imposition of a broader duty "would be to place an unacceptably severe burden on those who provide mental health care to the people of this State, ultimately reducing the opportunities for needed care"). In addition, as noted, numerous states have codified similar, practical limits on a mental-health care provider's duty of care to third parties. See D. Mossman, Critique of Pure Risk Assessment, or Kant Meets Tarasoff, 75 U. Cin. L. Rev. 523, 586 n.204 (2006) (observing that, "[t]o clarify clinicians' responsibilities, many states have enacted laws that limit therapists' potential liability if they take specified actions when a patient makes a serious threat against an identifiable victim" (quotation omitted)); Nat'l Conference of State Legislatures, Mental Health Professionals' Duty to Warn, www.ncsl.org/research/health/mental-health-professonals-duty-to-warn.aspx (2015) (collecting state statutes).

¶ 96. The point here is not that the Court has adopted a minority position without expressly acknowledging it. If that were the problem, it would be enough to simply articulate the competing viewpoint, and agree to disagree. However ill-advised the majority's choice, it would at least be based on familiar ground. And while the decision to abandon a standard that so many states have found to be the proper balance between competing public-policy interests might be mistaken, it would at least have the virtue of transparency.

¶ 97. The problem here is altogether different, however, and far more serious. For the majority not only expands the scope of a therapist's duty beyond the limits recognized by this Court in Peck, it creates an entirely new duty of care which plaintiffs here have labeled a duty to "train" and the majority sees fit to recast as "a duty to 'inform' that incorporates some elements of what plaintiffs describe as a distinct duty to 'train.' " Ante, ¶ 53. Elsewhere, the majority variously describe this as: "a duty to provide reasonable information to the parents to enable them to recognize the dangers and fulfill the responsibilities envisioned for them in the treatment plan," ante, ¶ 44; a duty that "contemplates more than simply advising the parents that their son posed a risk," but also providing "reasonable information . . . to help keep their son safe," ante, ¶ 53; and

49

a duty to notify the caregiver of the risks "and of the steps he or she can take to mitigate the risks," ante, ¶ 82.

¶ 98.   If mental-health care providers, patients and their families, and the legal counsel who advise them remain uncertain as to the precise nature and scope of this new duty, they are to be forgiven.  For the Court is making this up as it goes, with no input from the mental health profession on whether standards even exist for such a duty.  This is not an easy task.  But the real difficulty lies ahead, when this Court has moved on and the mental health care community must continue to grapple with the implications.

¶ 99.   For make no mistake, this holding is extraordinary in its scope and implications. To recall, most duty-to-protect cases have divided along a fault-line between those limiting the duty to identified or reasonably identifiable targets of violence and those that would include all "foreseeable" victims, the latter generally predicated on a duty to treat and, if necessary, confine a dangerous patient given the general impracticality of warning all remote, albeit foreseeable victims.  The majority rejects the principle that a therapist's duty extends only to reasonably identifiable targets of specific threats by the patient.  It also rejects as a matter of policy any duty to control a mental-health patient through involuntary commitment.  Ante, ¶ 79.

¶ 100.  Out of this seeming impasse the majority creates a new duty—a duty to warn  not the patient or the patient's targeted victims, but the patient's parents or, more broadly, his or her "caretakers" so that they may control the patient and prevent injury to the public.   .  This is worth a moment's reflection.  As a matter of policy, according to the majority, no liability may attach to E.R.'s mental health providers for their allegedly negligent failure to control E.R.'s conduct by providing for his involuntary commitment.  Nevertheless, liability may attach to the same defendants for their allegedly negligent failure to enable E.R.'s parents to control his conduct by providing them with adequate warning and information to "mitigate the risks."  Ante, ¶ 82.

¶ 101.  The imposition of a duty so novel and with such potentially broad consequences for mental health care providers, their patients, and the general public surely requires a more solid

foundation than an allegation in a complaint. Recognizing that this case remains at the pleading stage, duty nevertheless constitutes an essential element of plaintiffs' cause of action, and its existence is a question of law which this Court must decide in the first instance in light of all relevant policy concerns. See Endres v. Endres, 2008 VT 124, ¶ 11, 185 Vt. 63, 968 A.2d 336 (noting that "duty . . . is central to a negligence claim" and that "its existence is primarily a question of law" based on "those considerations of policy which lead the law to say that the plaintiff is entitled to protection" (quotation omitted)). Yet nothing in plaintiffs' complaint even remotely identifies the basis for recognizing a so-called duty to "inform" a patient's parents or "caretakers" to protect the public. Nothing in plaintiffs' briefing below or before this Court identifies any medical treatises or other literature defining and describing the basic clinical standards, practices, and therapeutic goals underlying such a duty. Nothing in the briefing identifies any decisional law or authority elsewhere specifically recognizing and imposing such a duty.

¶ 102. We do, on the other hand, know from plaintiffs' complaint that certain actions were taken by defendants after E.R.'s discharge. We know that the Brattleboro Retreat made an aftercare treatment plan for E.R. and reviewed it with E.R. and his parents, and that the plan "involved E.R. being seen on a regular basis" at NKHS. We know that the medical professionals at the Retreat prescribed medications for E.R. to take on a daily basis. We know that E.R. met with a "treatment team" at NKHS, and that a "cognitive remediation therapy" plan was put in place and signed by E.R. We know that E.R told his mother in mid-December 2010 that he had ceased taking his medications, and that she reported this to NKHS. And we know that, on the day of the assault, E.R.'s father had taken E.R. with him to oversee work being done at an apartment building owned by E.R.'s grandfather.

¶ 103. These facts themselves, hardly unique, highlight the most significant deficiency in the majority's newfound duty. Even assuming that plaintiffs could establish through expert evidence some professional standards for the duty owed to a patient's caretaker, the imposition of such a duty demands consideration of the policy implications underlying it—its practical benefits

51

against its societal costs. See Langle v. Kurkul, 146 Vt. 513, 519, 510 A.2d 1301, 1305 (1986) (noting that existence of duty is primarily question of law dependent on variety of policy concerns, including "the closeness of the connection between the defendant's conduct and the injury suffered," the "burden to the defendant," and the "consequences to the community" (quotation omitted)).

¶ 104. The facts alleged by plaintiffs show that, even with the practical steps undertaken by defendants and E.R.'s parents to facilitate his functioning safely in a less restrictive environment than a closed hospital ward—providing an aftercare plan and reviewing it with E.R.'s parents, establishing an outpatient treatment team, prescribing him daily medication, endeavoring to monitor his activity by taking him to job sites, and reporting that he had stopped his medication—they could not prevent him from perpetrating a spontaneous act of violence.

¶ 105. The majority's speculation that defendants might have provided some additional "information" to E.R.'s parents to prevent the assault simply misses the point. To impose such a duty on health care providers undermines the fundamental policy underlying our mental health care system, a policy designed to maximize a patient's freedom and dignity by providing treatment in the least restrictive environment available. It is the same policy resoundingly reaffirmed by the majority today in refusing to impose a tort duty on health care providers to institutionalize a patient. See ante, ¶ 77 (rejecting duty to institutionalize mental health patient to avoid "an increase in unjustified commitments and abandonment of treatment-in-the-least-restrictive-environment" policy).

¶ 106. Uncertainty counsels caution, for courts and clinicians alike. Any responsible mental health care provider uncertain as to how, if at all, to satisfy this new, amorphous duty to train or assist a patient's "caretaker" sufficiently to prevent future harm might understandably decide to err on the side of a more—rather than a less—restrictive treatment setting rather than risk a lawsuit by the random victim of an outpatient assault. Moreover, considering the many adult patients living with someone who could be characterized as a "caretaker"—be it the patient's

52

parents, spouse, domestic partner, or friend—the consequences of such decisions could be far reaching. Balanced against the dubious odds of actually predicting, much less preventing, random acts of violence by a patient absent any specific threat or identifiable victim, the risk becomes prohibitive.

¶ 107. The expected response to these concerns is that they are merely "speculative" while we know—in contrast—that mental health providers routinely make predictions of dangerousness in deciding to commit a patient and routinely apply Tarasoff when deciding whether a patient poses a threat. Thus, it is easy to posit that the concern for overcommitment is exaggerated or unfounded, that no responsible mental health care provider would involuntarily hospitalize a nondangerous patient to avoid a lawsuit, much less release a dangerous one despite the risk to the public.

¶ 108. The flaw in this response is the assumption that there are "yes" or "no" answers to the mental health clinician's decisions. The relevant medical and legal literature, however, belies this assumption. There are, in fact, no answers, but only imperfect assessments of differential levels of risk, and there are no clear standards defining the level of risk sufficient to trigger protective measures. See, e.g., Mossman, supra, 75 U. Cin. L. Rev. at 567, 577 (observing that most recent medical studies show that "a therapist's predictive knowledge about future violence is really an ability to make risk estimates," while "there is and can be no rationally established, broadly accepted criterion for what probability of risk constitutes the level of 'serious danger' that should trigger a protective response"); Herbert, supra, 30 J. Am. Acad. of Psychiatry & Law at 422 (noting the "residuum of uncertainty" in assessing whether "a patient really means particular words as a threat"). Tarasoff has worked, according to surveys and studies, because most states employ reasonably clear, narrow, and understandable standards that require a serious threat to a reasonably identifiable target. See, e.g., Rosenhan, supra, 24 Pac. L.J. at 1203, 1208, 1217 (findings from broad survey of psychotherapists showed that, while very small percentage rated their ability to assess dangerousness "very accurately," most understood duty to protect was predicated on identification of specific victim and believed that duty was consistent with ethical

obligations); Mossman, supra, 75 U. Cin. L. Rev. at 603 (noting that clinicians have sought and been well served by "statutory boundaries on the duty to protect, boundaries that tell them when the duty arises (usually, following explicit threats toward specific targets) and that define the ways of discharging the duty"); M. Soulier, et al., Status of the Psychiatric Duty to Protect, Circa 2006, 38 J. Am. Acad. of Psychiatry & Law 457, 471-72 (2010) (concluding from surveys of psychotherapists and review of legal evolution of Tarasoff duty that "statutes appear to promote a useful social policy, limiting the duty to protect to cases in which victims are identified or reasonably identifiable" and as such pose little threat to clinician's ability to practice). The broad duty created by the majority, in contrast, contains none of the limits that form a natural and necessary counterbalance to the risks of defensive practice and overcommitment in the mental-health context.

¶ 109. To dismiss the concerns of the mental health care profession in this case as speculative or even self-serving, moreover, is presumptuous. It is all too easy to assign new duties to a profession we know little about, and have no responsibility to implement. Judicial restraint in creating duties for other professions is not an end in itself; it is the end-result of recognizing our own limitations. It is wisdom grounded in humility.

¶ 110. The majority ultimately attempts to minimize its decision's impact by noting the "significant obstacles" in the way of any successful lawsuit, including the plaintiffs' need to prove the "necessary facts," a "failure to disclose the necessary information," as well as "causation—that any failure to inform . . . was more likely than not a but-for cause of their injuries." Ante, ¶ 83. This may reassure the majority, but it is cold comfort to the mental health-care providers and their colleagues and families compelled to endure the personal and professional disruptions, stress, and financial burdens of protracted lawsuits predicated on this amorphous new duty, regardless of their ultimate success.

¶ 111. Finally, I would note that the majority's alternative basis for imposing a duty of care predicated on its conclusion that "E.R.'s parents fell within the 'zone of danger' from E.R.'s

54

conduct" is equally flawed and unpersuasive. Ante, ¶ 47. The zone-of-danger doctrine, as noted, simply extends the therapist's duty to persons within a finite class of reasonably identifiable potential targets. Thus, in the case cited by the majority, Hamman v. County of Maricopa, the record showed that the patient had "expressed jealousy of his stepfather" to the therapist; that the patient's parents had expressed concern to the therapist for their safety and begged the therapist to admit the patient to the hospital; that the therapist failed to do so; and that the patient subsequently attacked his stepfather with an electric drill. 775 P.2d at 1123-24. Based on these facts, the court reasonably concluded that, despite the absence of a specific verbalized threat against the parents, "they were readily identifiable persons who might suffer harm." Id. at 1128.

¶ 112. Despite the majority's statement that it "find[s] Hamman persuasive and follow[s] its reasoning," ante, ¶ 49, nothing on the limited factual record here brings this case within the "zone of danger" doctrine articulated in Hamman and elsewhere. First, the complaint did not allege that E.R. had threatened either his parents or a class of persons that might reasonably be construed to include his parents.[25] Nor did plaintiffs claim, as the majority argues, that E.R.'s earlier aggression toward a member of the staff at the Retreat somehow brought E.R.'s parents into the zone of danger applicable to all "caretakers." To suggest that a threat against a nurse, therapist, physician or other mental health care provider somehow represents a threat against an identifiable class of all family members and friends who help with the patient's outpatient care would stretch the "zone of danger" doctrine beyond recognition.

¶ 113. Second, and more significantly, the doctrine was designed to protect a slightly expanded class of reasonably identifiable potential victims, and E.R.'s parents were not the victims here. As noted, plaintiffs did not allege any threats—explicit, implicit, or otherwise—against his parents. Nor is there any factual basis to support a conclusion that the actual victim, Mr. Kuligoski,

---

[25]    At the motion hearing, plaintiffs' counsel readily conceded that "there was no identifiable victim" in this case.

55

was within an identified or identifiable class of potential victims. The "zone of danger" argument thus fails entirely.

¶ 114. This Court has repeatedly cautioned against placing "our imprimatur" upon a new legal duty "without first determining whether there is a compelling public policy reason for the change." Langle, 146 Vt. at 520, 510 A.2d at 1306; accord Goodby v. Vetpharm, Inc., 2009 VT 52, ¶ 11, 186 Vt. 63, 974 A.2d 1269; Knight v. Rower, 170 Vt. 96, 107, 742 A.2d 1237, 1245 (1999); Smith v. Luman, 148 Vt. 595, 599, 538 A.2d 157, 158 (1987). The majority identifies no compelling public policies to warrant the extraordinary duty it imposes on mental health care providers by today's ruling. On the contrary, settled public policy governing our treatment of the mentally ill demands precisely the opposite result. I therefore respectfully dissent.

¶ 115. I am authorized to state that Justice Skoglund joins this dissent.

_____
Chief Justice

¶ 116. **SKOGLUND, J., dissenting.** I concur in the Chief Justice's well-reasoned, indeed unassailable, dissent. The majority has created a heretofore unheard of duty based on an allegation in a complaint. This new duty to train or assist or inform a patient's caretakers so as to protect the public finds no support in case law or public policy. It is illogical, potentially fatal to effective patient-therapist relationships, and places an impossibly onerous obligation on those who provide mental health care to the people of this state.

¶ 117. The facts of this case center around an unprovoked, spontaneous act of violence directed against a stranger by an individual suffering from a serious mental illness. Nothing short of anticipatory confinement in a hospital could have prevented it. But now, severely crippling Vermont's public policy of treatment of the mentally ill in the least restrictive environment, the majority has delivered a cautionary tale involving the threat of tort liability for releasing a mentally

56

ill person to people not sufficiently warned/trained to provide care and control. This is a preposterous, reckless decision.

¶ 118. The majority opinion identifies the cautious and thoughtful evolution of the duty owed by mental health professionals begun in Tarasoff v. Regents of University of California, 551 P.2d 334 (Cal. 1976), Thompson v. County of Alameda, 614 P.2d 728 (Cal. 1980), and the cases that came after. It then abruptly abandons consideration of identified victims or reasonably identifiable victims and finds a duty "to warn E.R.'s parents as individuals in the 'zone of danger' of E.R.'s dangerous propensities." Ante, ¶ 52. However, in the same paragraph it limits the duty only to those who are engaged with the patient's treatment, not those that simply live with him. Ante, ¶ 52. That "zone" is flexible, fluid and ambiguous.

¶ 119. First of all, I posit that the parents of E.R. knew he could be dangerous as it was his behaviors in their home that precipitated his initial hospitalization. They were privy to the discharge summary from the Brattleboro Retreat and worked with the Retreat to develop an aftercare treatment plan that included regular visits to Northeast Kingdom Human Services (NKHS). They were aware he was on antipsychotic medications and had been told that they should give E.R. his medications and not rely on him to medicate himself. The mother knew enough to be concerned when E.R. told her he had stopped taking his medication. They had been warned. They knew E.R. could be dangerous when deep in his illness. What further warning should have been offered remains a mystery.

¶ 120. What is substantially more troubling is the framework upon which the majority builds its new duty. As explained by the Chief Justice in his dissent, the majority relies on the "zone-of-danger" doctrine that simply is not implicated in this case. There is no allegation E.R. threatened his parents. The parents were not injured. And, the actual victim could not have been identified as a reasonably identifiable potential victim, the expanded class the doctrine is designed to protect.

57

¶ 121.  The majority finds Hamman v. County of Maricopa, 775 P.2d 1122 (Ariz. 1989), "persuasive" and claims to follow its reasoning.  The Hamman case is completely distinguishable from the case at bar.  In Hamman, the doctor refused to admit the patient to the hospital and, according to the parents, told them their son was "harmless."  Id. at 1123.  Two days later, the son viciously attacked the stepfather.  The court noted that the doctor was aware that schizophrenic-psychotic patients are prone to unexpected episodes of violence, knew that the son was living with his parents, and thus should have known that "[i]f indeed [the doctor] negligently diagnosed [the son] as harmless, the most likely affected victims would be the Hammans.  Their constant physical proximity to [their son] placed them in an obvious zone of danger.  The Hammans were readily identifiable persons who might suffer harm if the psychiatrist was negligent in the diagnosis or treatment of the patient."  Id. at 1128.  The majority neglects to provide any analysis to link the case at bar with the situation described in Hamman.

¶ 122.  Under this new duty, mental health providers will have to consider generalized threats of violence directed against no one in particular, which I suggest are commonplace with severely ill patients, and will have to weigh whether to violate the patient-physician privilege, thus damaging whatever therapeutic relationship existed and perhaps the treatment of the patient as well.  After the risk assessment, they will then, in trying to place the patient in the least restrictive environment available, need to do an educational assessment of potential caregivers.  As the Chief Justice notes, the majority identifies no professional standards, legal authority, or public policies to support a duty so "extraordinary in its scope and implications."  Ante, ¶ 99.  Long after this Court has forgotten about it, this amorphous duty to train or assist will continue to perplex and bedevil practitioners in the field of mental health who must actually attempt to understand the obligations imposed and comply.

¶ 123.  Finally, the majority disposes of statutes and regulations that govern confidential communications between patient and physician by suggesting that, one, they only codify an evidentiary privilege, and two, they do not prohibit disclosure to "caregivers" involved in the

patient's aftercare plan. <u>Ante</u>, ¶ 61. This is a breathtaking disregard for the tort liabilities or ethical claims that can result from the disclosure of health information or history and a startling conclusion that no objection occurs to them for the wholesale disclosure of a person's mental health condition and history to the ambiguous sobriquet "caretaker."

¶ 124.   The manner in which the majority disposes of the requirements of HIPAA's Privacy Rule is rather cavalier. It notes two exceptions relevant to the disclosure obligation imposed in this decision. The first, the dangerous patient exception to the confidentiality requirement intended to "avert a serious threat to health or safety," permits disclosure when the disclosure "is necessary to prevent or lessen a serious and imminent threat to the health or safety of a person or the public." 45 C.F.R. 164.512(j).   Relying on "E.R.'s propensity for violence," the majority finds the subsection permits disclosure, ignoring the requirement that a perceived serious threat must be <u>imminent</u>.

¶ 125.   The majority identifies a second useful exception, one providing for standard uses and disclosures for involvement in an individual's care and notification purposes, citing to the provision for emergency circumstances. 45 C.F.R. 164.510(b)(3). The majority forgets to mention that the section's primary application is for "Limited uses and disclosures when the individual is not present." It then latches onto the conjunctive modifying language contained in the section, "[i]f the individual is not present, or the opportunity to agree or object to the use or disclosure cannot practicably be provided because of the individual's incapacity or an emergency circumstance," to support its dismissal of HIPPA concerns. I suggest that the section is intended to apply when "the individual's incapacity" is of a sort that renders him unconscious. Again the majority finds the subsection permits disclosure.

¶ 126.   Decisions to create and impose new legal duties on other learned professions have profound consequences. To impose a novel legal duty on mental health care professionals without extensive discussion of the professional knowledge, skills, and practice standards—if any—that

59

may apply and the policy consequences that may result, is not merely, as the Chief Justice suggests, "presumptuous." It is the essence of judicial arrogance.

 

 

 

                              _____

                              Associate Justice