

SUPERIOR COURT
Washington Unit

CIVIL DIVISION
Docket No. 228-4-18 Wncv

2021 JAN 22 P 12: 20

FILED

Christopher A. Delbrocco,
Plaintiff

v.

State of Vermont,
State of Vermont,
Defendants

DECISION ON MOTION

Regarding the State's Motion for Summary Judgment

Plaintiff Christopher DelBrocco claims that, during his former employment with Defendant the State of Vermont, the State violated the Vermont Fair Employment Practices Act (VFEPA), 21 V.S.A. §§ 495–496a, by engaging in sex-based wage discrimination, paying him substantially less than a comparable female employee, Ms. Helen Tanona. He also alleges fraud regarding misrepresentations about or concealment of the State's hire-into-range policy, defamation regarding statements made about him in the course of an internal investigation of his wage discrimination claim, and negligence regarding implementation of the hire-into-range policy. The named defendants in this case are the "State of Vermont Agency of Human Services" and the "State of Vermont Agency of Administration," both of which, together, are simply the State of Vermont (no individuals are defendants). The State has filed a motion for summary judgment addressing all claims of the complaint, which Mr. DelBrocco opposes.[1]

*The Equal Pay Claim*

Mr. DelBrocco's principal claim is that the State discriminated against him on the basis of sex by paying Ms. Tanona much more than him. In the complaint and in briefing, he is clear that both were hired by the Agency of Human Services (AHS) under the general job classification IT Project Manager IV, and he believes that his experience, knowledge, and capabilities were superior to those of Ms. Tanona, who nevertheless was paid far more than him due to widespread bias in favor of women at AHS.

While the State's summary judgment briefing is lengthy (its principal memorandum in support of summary judgment is 50 pages), and Mr. DelBrocco's briefing is extraordinarily

---

[1] The State filed a reply to Mr. DelBrocco's opposition filing. In return, Mr. DelBrocco filed a "sur-reply." The civil rules do not contemplate sur-replies, and Mr. DelBrocco did not seek leave to file one. For these reasons, the court will not consider Mr. DelBrocco's sur-reply. Mr. DelBrocco's extraordinarily lengthy opposition filing—172 pages without exhibits—surely left no stone unturned.

lengthy (his principal opposition brief is 172 pages), careful consideration of the underlying law reveals that this case is more straightforward than the voluminous filings make it look.[2]

Under VFEPA, it is an unlawful employment practice "[f]or any employer . . . to discriminate between employees on the basis of sex by paying wages to employees of one sex at a rate less than the rate paid to employees of the other sex for equal work that requires equal skill, effort, and responsibility and is performed under similar working conditions" unless the disparity is due to a nonprohibited reason. 21 V.S.A. § 495(a)(7). The Vermont Supreme Court has described the proper structure of analysis of an equal pay claim as follows:

> The Vermont statute is modeled on the Federal Equal Pay Act, 29 U.S.C. § 206(d), which was passed "to legislate out of existence a long-held, but outmoded societal view that a man should be paid more than a woman for the same work." Similar to its Vermont analog, to establish a prima facie case under the federal equal pay act, a plaintiff must establish that "an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" A claim under the equal pay act does not require proof of discriminatory intent.
>
> Like Vermont's statute, once a prima facie case is established, the burden shifts to the employer to establish one of four affirmative defenses contained in the statute. These are that the difference in payment is due to "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." The employer carries the burden of persuasion, not just production, in asserting its defense. An employee may rebut the employer's affirmative defense "with evidence that the employer intended to discriminate, and that the affirmative defense claimed is merely a pretext for discrimination." Because Vermont's statute is based on its federal counterpart, this Court may consider federal decisions as persuasive authority.

*Vermont Human Rights Com'n v. State, Dept. of Corrections*, 2015 VT 138, ¶¶ 18–19, 201 Vt. 62 (citations omitted); see also Black's Law Dictionary, prima facie case (11th ed. 2019) ("A party's production of enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor.). Although the historically prevalent discrimination that prompted adoption of the statute burdened women, there is no dispute that the statute protects men as well.

---

[2] Mr. DelBrocco's summary judgment briefing is unconventional, to say the least. It consists largely of one enormous challenge to the State's statement of undisputed facts. Mr. DelBrocco nowhere sets forth a counter-statement, briefs the law generally, or provides any legal analysis of his equal pay claim (or any other of his claims).

2

"The equal work standard is the battleground in many EPA cases." 1 Mark A. Rothstein, Employment Law § 4:14 (6th ed.). The Vermont Supreme Court has described the basic standards applicable to the "equal work" inquiry as follows:

> In comparing the jobs performed by plaintiff and [the comparator], the inquiry focuses on the primary duties of each job. Equal jobs must have a common core of tasks. Equal work does not mean that the jobs must be identical; rather, they must be substantially similar. "The statute explicitly applies to jobs that require equal skills, and not to employees that possess equal skills." Thus . . ., "we compare the jobs, not the individual employees holding those jobs." In comparing two jobs, abilities of persons in the positions are not relevant.

*Ballard v. University of Vermont*, 166 Vt. 612, 614 (1997) (citations omitted). "To satisfy the substantial equality test, jobs must share a common core of tasks; 'a significant portion' of the two jobs must be identical." 1 Employment Law § 4:14 (footnote omitted). "Similarity in titles or job descriptions is insufficient to prove substantial equality if the actual tasks are different." 3 Employment Discrimination Law and Litigation § 26:4. Jobs that are different but of "comparable worth" to the employer are not for that reason substantially equal for purposes of an equal pay claim. 1 Sex-Based Employment Discrimination § 7:3. The comparative worthiness of the plaintiff and the comparator to the employer is not the point.

Mr. DelBrocco has the burden of coming forward with sufficient evidence to support a reasonable inference that he and Ms. Tanona undertook "equal work"—that is, that they fundamentally had the same core job—before there is any need to analyze whether the State's determination to pay Ms. Tanona more than Mr. DelBrocco was lawful. He has not done so.

In support of its assertion that Mr. DelBrocco and Ms. Tanona had very different positions at AHS, the State has produced, among other things, detailed affidavits from Paul Pratt and John Kohlmeyer and complete transcripts of the depositions of Mr. DelBrocco and Ms. Tanona. The evidence produced by the State clearly shows that Mr. DelBrocco and Ms. Tanona had very different jobs. Though perhaps both could be fairly characterized as project managers in a general sense, Mr. DelBrocco focused on vendor management while Ms. Tanona did high-level, general project management. While Mr. DelBrocco goes to great lengths to attempt to show that most anything Ms. Tanona did, he in some way did too, at least at times, any such episodic similarities are insufficient—they do not show that they essentially had the same functions and did the same things in some ongoing "core" way.[3]

---

[3] While Mr. DelBrocco repeatedly attempts to show that he did what other project managers did, as if to demonstrate that they were all project managers (impliedly doing the same things), asking the question in reverse, on this record, is illuminating: did Ms. Tanona do what the vendor managers did? The record is clear enough: not so much.

At the relevant time, Mr. Pratt, a professional project manager, had the role of IT Director for AHS. He managed AHS's project management office (PMO) and was directly supervised by Chief Information Officer Darin Prail. Project management, generally, is the "practice of planning, executing and monitoring the work of a team of individuals to achieve specific goals and success criteria within a limited time period and budgeted resources." Affidavit of Paul Pratt ¶ 12 (filed Dec. 30, 2019). The PMO supervised by Mr. Pratt "was tasked with planning, designing, developing, testing, implementing and evaluating various IT-related projects, such as IT software, hardware and networks, that supported the delivery of AHS benefits and services to the public, including the Vermont Health Connect platform." *Id.* ¶ 5 (filed Dec. 30, 2019).

Mr. Pratt directly supervised Mr. John Kohlmeyer, whose role within the PMO was to lead the Vendor Management Team. Mr. DelBrocco and one other person were hired to be vendor managers in the Vendor Management Team and were directly supervised by Mr. Kohlmeyer. Vendor management in this context is a part of the larger project management enterprise that focuses on third-party vendors. It may include (a) researching and solicitation of project vendors; (b) bid solicitation and evaluation; (c) monitoring vendor performance and invoicing; and (d) acting as a communications liaison between the vendor, project management team, and other stakeholders. Affidavit of John Kohlmeyer ¶ 17 (filed Dec. 30, 2019). "The purpose of the PMO Vendor Management Team was to more effectively ensure that outside vendors contracted to provide deliverables for AHS IT projects and programs would be held accountable for their contractual obligations to the State and thereby support the PMO's mission of ensuring AHS IT project and program success." *Id.* ¶ 20.

Ms. Tanona was hired to be a "senior" or "lead" project manager with higher level project management and supervisory responsibilities.[4] She was not hired to be an entry level project manager or to do vendor management specifically. When she first was offered the position, she rejected the pay rate, which eventually was increased significantly through the State's hire-into-range policy (accounting for the disparity at issue in this case).

Mr. DelBrocco dismisses Mr. Pratt's and Mr. Kohlmeyer's affidavits as replete with lies and distortions and as issued in bad faith. Otherwise, he claims that, despite their obvious expertise in their fields, much of what they say requires independent expert testimony that the State has not presented. He also dismisses many of their factual assertions as vague opinions. For that and other reasons, Mr. DelBrocco persistently claims that facts that have substantial evidentiary support instead necessarily must be matters for the jury to sort out. On balance, the court is not persuaded that any of these arguments shows that any significant testimony proffered by Mr. Pratt or Mr. Kohlmeyer is inadmissible. It is insufficient for summary judgment

---

[4] Mr. DelBrocco's persistent objections that there never was any formal job title known as Senior or Lead Project Manager, and emphasis that both he and Ms. Tanona shared the same job classification, IT Project Manager IV, has little relevance to the inquiry. The issue is whether the two employees' functions shared a common core of tasks so similar as to reveal that they performed *equal work*. Labels and titles related to their jobs are little more than distractions as far as this analysis goes.

4

purposes to simply attack an affiant's integrity or motivations and pronounce the subject of the testimony a matter thus to be determined by a jury. It is similarly ineffective to mislabel an allegation of fact an opinion or to insist on third-party expert testimony without any showing that such testimony is necessary. Generally, to show that a well-supported material fact is genuinely disputed, the party opposing summary judgment must come forward with countervailing evidence.

Mr. DelBrocco also devotes substantial energy to diminishing Ms. Tanona's professional experience, skills, worthiness, and value to her employer. He devotes equal energy to praising his own. The minutiae of both topics are explored exhaustively in Mr. DelBrocco's 172-page brief.

It is unnecessary to vet those minutiae here. The fundamental problem with Mr. DelBrocco's equal pay claim is that his briefing and factual presentation is nowhere clearly calculated to show that he and Ms. Tanona had, in material respects, equal jobs. "Factors such as experience and training may justify a pay differential between two employees performing equal work, but those factors enter the case as affirmative defenses, *not as part of the plaintiff's prima facie case*." 1 Mark A. Rothstein, Employment Law § 4:14 (emphasis added). Having "some but not all of" the same duties is insufficient. *Miller v. Automobile Club Of New Mexico, Inc.*, 420 F.3d 1098, 1119 (10th Cir. 2005). Mr. DelBrocco's briefing is far more attuned to his view of his and Ms. Tanona's comparable worth and whether he was paid too little or she was paid too much. Comparable worth is irrelevant to the required showing that he and Ms. Tanona performed *equal work*. This leaves the State's well-supported showing of an ultimate fact—that the two had substantially different jobs—basically uncontested.

The court's review of the record shows that the undertakings of the PMO generally are complex. The vendor management role fulfilled by Mr. DelBrocco and the more generalized, high-level project management role fulfilled by Ms. Tanona clearly were complex, and both Mr. DelBrocco and Ms. Tanona plainly were highly skilled and experienced professionals. Their roles were related, and at times one may have undertaken a specific function that typically was more the focus of the other. Mr. Pratt and Mr. Kohlmeyer are clear that Mr. DelBrocco's function was to support the project management team, and that vendor management (as applicable here) is merely a subsidiary component to the larger project management enterprise. Mr. DelBrocco characterizes the matter somewhat differently. In his view, a good vendor manager has to be highly skilled in all facets of project management and then specializes in the more complex area of vendor management.

The details of Mr. Pratt and Mr. Kohlmeyer's view and Mr. DelBrocco's view do not need to be sorted out in any detail here. See *Beck-Wilson v. Principi*, 441 F.3d 353 (6th Cir. 2006) ("Whether a job is substantially equal . . . is determined on a case-by-case basis and 'resolved by an overall comparison of the work, not its individual segments.'" (citation omitted)). More generally speaking, the summary judgment record, viewed in its composite, is clear that Mr. DelBrocco's core function was to be vendor manager, that Ms. Tanona's core function was to be a high-level project manager generally, and as undertaken, these were readily distinguishable roles. See *Simpson v. Merchants & Planters Bank*, 441 F.3d 572, 578 (8th Cir.

5

2006) ("Whether two jobs entail equal skill, equal effort, or equal responsibility requires a practical judgment on the basis of all the facts and circumstances of a particular case." (quoting *EEOC v. Universal Underwriters Ins. Co.*, 653 F.2d 1243, 1245 (8th Cir. 1981)). There was overlap, there were mutual interests, and they were on the same team—the PMO—but they had different core functions and tasks. See *Ferroni v. Teamsters, Chauffeurs & Warehousemen Local No. 222*, 297 F.3d 1146, 1149 (10th Cir. 2002) ("'Like' or 'comparable' work does not satisfy this standard, and '[i]t is not sufficient that some aspects of the two jobs were the same.'" (citation omitted)).

Mr. DelBrocco's equal pay claim fails as a matter of law for that reason. Ms. Tanona is not a valid comparator; her position was substantially different from Mr. DelBrocco's. His laser focus on her is misplaced. Because there is no sufficient threshold showing of equal work, there is no need to evaluate the State's affirmative defenses.

*Fraud and Defamation*

Mr. DelBrocco's fraud and defamation claims are not well-articulated in the complaint or in briefing.[5] To the extent that the court can understand them, he claims that there were intentional misrepresentations about or concealment of the State's hire-into-range policy in the course of his hiring that somehow prevented him from taking advantage of the policy. He asserts that false and defamatory statements were made about him (principally by his supervisor, Mr. Kuhlmeyer) in the course of an internal investigation by the State of his wage discrimination claim. The State generally denies liability as to the merits of either claim. It seeks summary judgment on the issue of sovereign immunity, which it argues is retained for both claims. With regard to defamation, it argues in the alternative that any defamatory statements were privileged.

Common law "[s]overeign immunity shields the state from suit in its own courts and confers immunity from liability for torts committed by its officers and employees." *Libercent v. Aldrich*, 149 Vt. 76, 80 (1987). Under the Vermont Tort Claims Act, 12 V.S.A. §§ 5601–5606, however, the State generally waives immunity to claims "for injury to persons or property or loss of life caused by the negligent or wrongful act or omission of an employee of the State while acting within the scope of employment." 12 V.S.A. § 5601(a). The State's waiver of immunity is subject to several exceptions which preserve immunity. The State argues that Mr. DelBrocco's claims for fraud and defamation are subject to the exception that applies to "[a]ny claim arising out of alleged assault, battery, abuse of process, misrepresentation, deceit, fraud, or interference with contractual rights." 12 V.S.A. § 5601(e)(6).

Mr. DelBrocco's fraud claim is exempt from the waiver pursuant to exception (e)(6) and thus is barred. Fraud connotes "an intentional misrepresentation of existing fact, affecting the essence of the transaction, so long as the misrepresentation was false when made and known to be false by the maker, was not open to the defrauded party's knowledge, and was relied on

---

[5] See supra n.2 at 2. Mr. DelBrocco nowhere briefs the law in relation to any of his non-statutory claims.

by the defrauded party to his damage." *Union Bank v. Jones*, 138 Vt. 115, 121 (1980). This appears to be the nature of Mr. DelBrocco's fraud claim. It is clearly encompassed by the expression "misrepresentation, deceit, fraud."

Mr. DelBrocco's defamation claim is unclear. Defamation consists of "(1) a false and defamatory statement concerning another; (2) some negligence, or greater fault, in publishing the statement; (3) publication to at least one third person; (4) lack of privilege in the publication; (5) special damages, unless actionable per se; and (6) some actual harm so as to warrant compensatory damages." *Crump v. P & C Food Markets, Inc.*, 154 Vt. 284, 291 (1990) (citation omitted). While Mr. DelBrocco certainly believes that false statements were made in the course of the investigation (as to his job duties and responsibilities), there is no explanation as to how any such falsehoods could have had a defamatory nature or other elements of a defamation claim might be satisfied here. See *Davis v. Am. Legion, Dept. of Vermont*, 2014 VT 134, ¶ 22, 198 Vt. 204 ("A defamatory statement is one that tends to 'blacken the reputation of the plaintiff and expose her to public hatred, contempt or ridicule.'").

In any event, the State interprets "misrepresentation, deceit, fraud" broadly to encompass Mr. DelBrocco's defamation claim, presumably because falsity and deception are the core of the asserted claim and the essence of misrepresentation, deceit, and fraud. Indeed, the exception applies broadly to any claim "arising out of" those expressions. "'Arising out of' are words of much broader significance than 'caused by.' They are ordinarily understood to mean 'originating from [,]' 'having its origin in,' 'growing out of' or 'flowing from,' or in short, 'incident to, or having connection with.'" *Hamilton v. United Healthcare of Louisiana, Inc.*, 310 F.3d 385, 391 (5th Cir. 2002) (citations omitted); cf. *State Farm Mut. Auto. Ins. Co. v. Roberts*, 166 Vt. 452, 460 (1997).

The Vermont Supreme Court appears to have concluded that defamation falls within the scope of exception (e)(6) in *Lomberg v. Crowley*, 138 Vt. 420, 424 (1980), overruled and abrogated by statute on other grounds. It also may have so ruled in *Amy's Enterprises v. Sorrell*, 174 Vt. 623, 623–624 (2002). Neither *Lomberg* nor *Amy's Enterprises* is crystal clear on this point, however.

The court concludes that, in the specific circumstances presented by this case, Mr. DelBrocco's "defamation" claim is properly exempt from the statutory sovereign immunity waiver under exception (e)(6). Mr. DelBrocco's defamation claim appears to predominantly address the falsity of the statements he finds objectionable rather than their defamatory nature. Defamation simply does not appear to be the crux of the claim. Misleading or false statements are closely related to misrepresentation and fraud; this claim thus appears to fall within the exception.

Even if sovereign immunity did not protect the State, however, Mr. DelBrocco's defamation claim would be subject to the "conditional privilege for an inferior state officer whose statements were made in performance of official duties." *Skaskiw v. Vermont Agency of Agric.*, 2014 VT 133, ¶ 11, 198 Vt. 187. Any allegedly defamatory statements were made in response to the State's internal investigation of Mr. DelBrocco's equal pay claim. They naturally

7

would have occurred within the speakers' performance of official duties. Mr. DelBrocco has not made any showing of malice that could possibly overcome the privilege. See *id.* The State is thus entitled to summary judgment on this claim.

*Negligence*

Mr. DelBrocco claims that the manner by which the State implemented its hire-into-range policy amounts to "negligence." Although the claim is unclear, he presumably intends by it that the State should have hired him into range, should not have hired Ms. Tanona into range, or having done so, should have increased his salary to maintain pay equity. The policy itself does not mandate any of these things. The State thus argues that there is no enforceable legal duty supporting any negligence claim and, to the same effect, that the economic loss rule prevents any recovery under a negligence theory.

Negligence must be premised on a legal duty. The basic elements of a claim of negligence include "a legal duty owed by defendant to plaintiff, a breach of that duty, actual injury to the plaintiff, and a causal link between the breach and the injury." *Demag v. Better Power Equip., Inc.*, 2014 VT 78, ¶ 6, 197 Vt. 176. Tort law generally does not govern compensation terms for employment, and Mr. DelBrocco does not identify any duty sounding in negligence law in the complaint or in briefing. He presumably intends that the State, having undertaken the implementation of its hire-into-range policy, thus necessarily assumed some duty (to him) to do so in a non-negligent manner. The mere fact that one engages in an undertaking, however, does not demonstrate that the undertaking was compelled by any enforceable legal duty.

The Vermont Supreme Court has described the concept of a legal duty for negligence purposes as follows. "Whether or not one party owes a duty to another is an expression of policy considerations about when people are entitled to legal protection. Thus, whether a duty is owed is primarily a legal question in which the Legislature or courts 'apply general categorical rules' establishing or withholding liability." *LeClair v. LeClair*, 2017 VT 34, ¶ 10, 204 Vt. 422 (citation omitted) (quoting Restatement (Third) of Torts § 7 cmt. a and citing *Kuligoski v. Brattleboro Retreat*, 2016 VT 54A, ¶ 19, 203 Vt. 328 (superseded by statute on other grounds)); see also *Kane v. Lamothe*, 2007 VT 91, ¶ 7, 182 Vt. 241 (explaining that the evaluation of a negligence claim against the State should begin with an assessment of duty).

But not every instance of perceived unreasonable conduct gives rise to a negligence claim. Actionable negligence claims only may exist where an enforceable legal duty can be identified. In this case, no legal duty is apparent. See Restatement (Third) of Torts: Liab. for Econ. Harm § 1 ("An actor has no general duty to avoid the unintentional infliction of economic loss on another."). Typically, "negligence actions are limited to those involving unanticipated physical injury" rather than purely economic losses. *EBWS, LLC v. Britly Corp.*, 2007 VT 37, ¶ 30, 181 Vt. 513. While economic losses are recoverable where certain *special relationships* between the parties give rise to a duty, a mere employee–employer relationship—a contractual relationship—is not such a special relationship, and Mr. DelBrocco has not identified any such

8

special relationship. See Dobbs The Law of Torts § 608 (2d ed.) ("When the plaintiff and defendant have a contract that can be treated as allocating the relevant economic risks, tort liability for those risks would undermine the parties' contractual ordering of responsibilities."); Restatement (Second) of Torts § 40(b)(4) (noting that employer has duty to employee who, at work, is in imminent danger or injured and helpless); 1 Modern Tort Law: Liability and Litigation § 3:13 (2d ed.); *Springfield Hydroelectric Co. v. Copp*, 172 Vt. 311, 316 (2001). There is no evident duty to support Mr. DelBrocco's negligence claim.

*Order*

For the foregoing reasons, the State's motion for summary judgment is granted.

The State shall submit a form of judgment. V.R.C.P. 58(d).


Robert R. Bent,
Judge